## UNITED STATES *v.* CHICAGO NORTH SHORE & MILWAUKEE RAILROAD CO.

No. 264. Argued December 16, 1932.—Decided January 9, 1933.

*Assistant to the Attorney General O'Brian,* with whom *Solicitor General Thacher* and *Messrs. Charles H. Weston* and *Elmer B. Collins* were on the brief, for the United States.

*Mr. Robert E. Quirk,* with whom *Messrs. Ralph R. Bradley* and *Claude D. Cass* were on the brief, for appellee.

4

6

Mr. Justice Roberts delivered the opinion of the Court.

This is a suit brought pursuant to § 12 (1) of the Interstate Commerce Act, as amended,[1] to enjoin the appellee from issuing any securities or assuming any obligation or liability in respect of the securities of others without first having obtained an order from the Interstate Commerce Commission authorizing such action, as required by § 20a of the Act.[2] The petition avers appellee's intention to issue or become guarantor of securities in violation of the last mentioned section.

The District Court, after making detailed and elaborate fact findings, concluded as matter of law that the rail-

---

[1] U. S. Code, Tit. 49, § 12 (1).

[2] U. S. Code, Tit. 49, § 20a.

road was an independently operated electric interurban railway expressly excepted from the requirements of the section. The question is whether the facts found warrant the decision.

Section 20a forbids a carrier to issue shares, bonds or obligations, evidence of interest or indebtedness, or to assume any obligation or liability of any other person or corporation, unless the Commission, upon application, after investigation, shall by order authorize such issue or assumption, as within the applicant's corporate purpose and compatible with the public interest. After prescribing the procedure before the Commission, and declaring its jurisdiction plenary and exclusive, the section enacts that securities or obligations not issued pursuant to its terms shall be void, and imposes civil and criminal liability upon officers and directors participating in their creation.

Paragraph 1 provides: "As used in this section the term ' carrier ' means a common carrier by railroad (except a street, suburban, or interurban electric railway which is not operated as a part of a general steam railroad system of transportation). . . ."

The properties of the appellee have developed, through various transfers and reorganizations, out of a street railway company organized more than twenty-five years ago. The company has for some years owned and operated in interstate commerce an electrified railroad, the main line of which extends from Chicago, Illinois, to Milwaukee, Wisconsin. There are 138 route miles of line, 132 miles of second track and 42 miles of yard and other track. About 40 miles of main and second track are in city streets, on some of which the appellee operates in common with street cars and vehicular traffic. In addition to the main line between Chicago and Milwaukee there is an alternate line for part of the distance; a branch some 36 miles in length; and two other branches, one of which is 3 and

the other 8 miles long. Operation in Chicago is over the elevated tracks of the Chicago Rapid Transit Company from the south side northerly through the loop district to a point on the north side (approximately 16 miles). Thence the line runs northerly through Chicago and Evanston to Wilmette, approximately 8 miles, over elevated dirt fill tracks owned by the Chicago, Milwaukee, St. Paul & Pacific Railroad Company, leased by the appellee jointly with the Chicago Rapid Transit Company. The remainder of the appellee's lines are upon its own right of way, or in streets the use of which is granted by local franchise. The total laid under local franchises, outside of Milwaukee, is approximately 3 miles; in the latter city the operation for 2.67 miles is over the tracks of a street surface railway owned by the appellee.

Twenty fast through passenger trains are operated daily in each direction between downtown Chicago and downtown Milwaukee with a running time equalling that of the fastest trains of the Chicago and Northwestern Railway, which operates fifteen through trains daily between the same cities. Dining cars and parlor cars are included in some of the appellee's fast trains. Modern, well equipped passenger stations are maintained at a number of points; 51 have agents selling passenger tickets; at some 96 places shelters and platforms are maintained, at 35 platforms only; and at 42 locations at which certain trains stop at streets or highways no facilities are provided. Through railroad and Pullman tickets are sold to any part of the United States, Canada or Mexico. Local passenger fares are computed on the mileage basis used by steam railroads.

Appellee's tracks are of standard gauge and are physically connected with those of four steam railroads at some thirteen points, and with those of three electric lines. Eight connections are used for handling interchange carload freight. The railroad has substantial facilities for

serving various industries located on its lines, such as side, industrial, team and switch tracks, and freight classification tracks. It owns seven electric locomotives which are of a small type and unable to haul freight trains of the size usually employed by steam railroads, and 114 freight cars which have no electrical equipment and are interchangeable with steam railroads. Sixteen local freight tariffs are published; in 206 tariffs the railroad participates as initial carrier, and in more than 800 as a delivering or intermediate carrier, in conjunction with steam railroads.

The total transportation revenue in 1930 was over $6,000,000, about 76% from passenger traffic and about 22% from freight. This ratio has been substantially maintained for some years. In 1930, 87% of carload freight traffic was interchange and 78% of all freight traffic was interline, but only 42% of freight revenue was derived from interline business.

Locomotives are not employed in the passenger service, the cars having installed electrical equipment, and being somewhat shorter and narrower than standard passenger railroad coaches. Freight is hauled by electric locomotives. A merchandise package delivery freight service is supplied by cars similar to baggage cars used on steam railroads, having self-contained electric equipment, operated from the loop in Chicago to Milwaukee in trains of from one to five cars. At certain points gantlet tracks are required for handling freight cars, as the clearances on the main line are insufficient to permit their passage. Grades are much heavier than those customary on steam railroads, and some of the curves are of so short a radius as not to permit the passage of a steam locomotive. The company maintains no facilities for receipt or delivery of carload freight at its termini in Chicago and Milwaukee, and cannot accomplish interchange of such freight at either, connections for this purpose being outside those cities.

The railroad was constructed to afford a fast electric passenger service between Chicago and Milwaukee and suburban passenger service into and out of Chicago. The freight business is subsidiary to this primary function, and is not fairly comparable to that ordinarily transacted by a standard steam railroad. Passenger traffic, whether measured by car service or by gross earnings, heavily preponderates over interline freight business. The main terminals serve only the passenger and merchandise freight traffic.

We thus have a typical example of an interurban electric line for passenger service, which has developed, in addition, such freight traffic as could advantageously be undertaken without interfering with performance of the main purpose of the carrier. The facts differentiate the present case from *Piedmont & Northern Ry. Co.* v. *Interstate Commerce Commn.*, 286 U. S. 299. There the railway was predominantly a carrier of interchange carload freight and the proposed extension of line, which was the subject of that litigation, had as its object the creation of a link in a trunk-line route composed of the electric line and a number of steam railroads, which would divert from other steam railroad trunk-line routes some $4,000,-000 of revenue annually. The purely local traffic in freight, passengers, baggage and express was there relatively inconsequential; but here greatly preponderates. It was there said: " In cases where an appreciation of the facts is requisite to proper classification it is not always easy to draw the line. Instances may be supposed where great difficulty might be experienced in determining whether an electric railway line falls within or without the exception of paragraph (22) [which is couched in the same words as the exception in § 20a (1)]. But this is not such a case. The facts clearly require a holding that petitioner's railway is not within the true intent and purpose of the exclusion intended by the paragraph." If the

status of the appellee were a matter of first impression, we should, though the decision is not free from difficulty, be inclined to hold § 20a inapplicable. But for the reasons about to be stated, we consider the question settled.

The definitions embodied in § 1, paragraphs (2) (a) and (3), embrace the appellee and render it subject to the jurisdiction conferred upon the Commission by the remaining sections, unless excepted by their terms. Interurban electric railways are expressly saved from the requirements of §§ 1 (18) to (21) inclusive, 15a and 20a. The language of the excepting clauses in the first and third instances is identical except for the use in one case of the singular and in the other of the plural number. That applicable to 15a, which is the section providing for fixing rates to yield a fair return, and for recapture, differs in substance from the two others and is: "excluding . . . (c) interurban electric railways unless operated as a part of a general steam railroad system of transportation *or engaged in the general transportation of freight. . . ."*

As indicated in the *Piedmont* case, *supra*, the phrase "interurban electric railway" may not in all circumstances be susceptible of exact definition. The Commission has realized the difficulty. In its 35th annual report, for 1921, this was said (p. 21):

"Under the law as it now stands, we have no jurisdiction over the issuance of securities of a 'street, suburban, or interurban electric railway which is not operated as a part of a general steam railroad system of transportation.' Certain electric railways independently operated are engaged in the general transportation of freight in interstate commerce in addition to the transportation of passengers. The use of electricity as motive power for railways is rapidly increasing. Some electric lines correspond substantially to steam roads in all important particulars except that of motive power. Under Section 15a

ot the act we are given authority to include in groups of carriers for rate-making purposes such interurban electric lines as are engaged in the general transportation of freight. It seems desirable that Section 20a of the interstate commerce act be so amended as to indicate definitely the classes of electric railway companies subject to that section."

The recommendation was repeated in the annual reports for 1923, 1924 and 1925.[3] In the report for 1928 (p. 83) the following appears:

" That the present exemption provisions of paragraph (22) of section 1, paragraph (1) of section 15a, and paragraph (1) of section 20a, applicable to electric railways, be amended by substituting provisions exempting all electric railways except such as interchange standard freight equipment with steam railways and participate in through interstate freight rates with such carriers; provision to be made for exemption of particular electric railways falling within the excepted class, if upon application they are able to show to the satisfaction of the commission, after notice and opportunity to be heard, that they are not affected with an important national interest so far as the provisions in question are concerned."

See also the 1929 report, p. 89.

The position heretofore taken by the Commission with respect to the appellee is of great significance. In 1923 a brief was filed with the Commission supporting the view that § 15 (a) had no application to the company because it was an interurban electric railway not operated as part of a general steam railroad system of transportation and not engaged in the general transportation of freight. The Director of the Bureau of Finance replied that unless later advised to the contrary the carrier would

---

[3] Annual Report of Interstate Commerce Commission for 1923, p. 70; Report for 1924, p. 78; Report for 1925, p. 72.

not be required to file returns under the section. No such advice has ever been communicated to the appellee.

The District Court finds that since July, 1916, when the Chicago, North Shore and Milwaukee Railroad, the immediate predecessor of appellee, acquired the properties, the appellee and its predecessors have issued securities aggregating $71,327,200 par value. Of this total $61,-662,600 have been issued since March 1, 1920, the date of the incorporation of § 20a into the Interstate Commerce Act. All of these securities were issued upon the authority and with the approval of the regulating commissions of Wisconsin and Illinois, and of those issued since March 1, 1920, $38,935,608 were outstanding in the hands of the public on April 30, 1931. The required annual reports filed by the appellee with the Commission have shown all securities issued since March 1, 1920, and in compliance with the rules have stated that these issues were each approved by the state commissions.

With this knowledge of the situation the Commission never, until it requested the Attorney General to institute the present suit, by word or act intimated that the procedure followed by the railroad was illegal or the state regulatory bodies without jurisdiction. It would be difficult indeed to conceive a clearer case of uniform administrative construction of § 20a as applied to this company. Conceding that the proper classification of the railway is not free from difficulty, all doubt is removed by the application of the rule that settled administrative construction is entitled to great weight and should not be overturned except for cogent reasons. *New York, N. H. & H. R. Co.* v. *Interstate Commerce Commn.,* 200 U. S. 361, 401; *Logan* v. *Davis,* 233 U. S. 613, 627; *Brewster* v. *Gage,* 280 U. S. 327, 336; *Fawcus Machine Co.* v. *United States,* 282 U. S. 375, 378; *Interstate Commerce Commn.* v. *New York, N. H. & H. R. Co.,* 287 U. S. 178.

The primary responsibility rested upon the Commission to determine whether under the circumstances the railroad was required to procure leave under § 20a for the issuance of securities. Evidently entertaining serious doubts on this question it has for more than a decade resolved them in favor of the carrier, and the company and its officers have acted in reliance on the administrative tribunal's construction of the statute. At this late day the courts ought not to uphold an application of the law contradictory of this settled administrative interpretation.

*Affirmed.*