## HUDSON & MANHATTAN R. CO. v. HARDY.

District Court, S. D. New York.
Feb. 4, 1938.

Cravath, deGersdorff, Swaine & Wood, of New York City (W. D. Whitney, John E. Buck, Francis A. E. Spitzer, and Harold R. Medina, Jr., all of New York City, of counsel), for plaintiff.

Lamar Hardy, U. S. Atty., of New York City (Robert L. Stern, Sp. Asst. to the Atty. Gen., of counsel), for the government.

Thomas M. Ross, of Washington, D. C. (Daniel W. Knowlton, of Washington, D. C., of counsel), for intervener Interstate Commerce Commission.

Ezra Brainard, Jr., and Alex M. Bull, both of Washington, D. C. (Carl A. Mead, of New York City, of counsel), for interveners Brotherhood of Locomotive Engineers, Brotherhood of Railroad Trainmen, and Brotherhood of Railroad Signalmen of America.

WOOLSEY, District Judge.

The plaintiff is entitled to a decree declaring that it is not a carrier as defined by the Railway Labor Act, § 1, as amended June 21, 1934, 45 U.S.C.A. § 151, and to such injunctive relief as will render that decree effectual as a protection to it.

I.   On June 21, 1934, the President of the United States approved an Act of Congress styled Public—No. 442—73rd Congress, June 21, 1934, c. 691, 48 Stat. 1185, 45 U.S.C.A. § 151 et seq., which amended the Railway Labor Act of May 20, 1926, c. 347, 44 Stat. 577.   By this act as thus amended, the National Mediation Board was created, and it was provided in section 1 that (paragraphing and italicizing mine) :

"Section 1.   When used in this Act and for the purposes of this Act—

"First. *The term 'carrier' includes any* express company, sleeping-car company, *carrier by railroad, subject to the Interstate Commerce Act,* and any company which is directly or indirectly owned or controlled by or under common control with any carrier by railroad and which operates any equipment or facilities or performs any service (other than trucking service) in connection with the transportation, receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, and handling of property transported by railroad, and any receiver, trustee, or other individual

or body, judicial or otherwise, when in the possession of the business of any such 'carrier':

"*Provided, however, That the term 'carrier' shall not include any* street, *interurban,* or suburban electric railway,

unless such railway is operating as a part of *a* general steam-railroad system of transportation,

but *shall not exclude* any part of *the* general steam-railroad system of transportation now or hereafter operated by any other motive power.

*The Interstate Commerce Commission is hereby authorized and directed upon request of the Mediation Board or upon complaint of any party interested to determine after hearing whether any line operated by electric power falls within the terms of this proviso.*"

II. The proceeding before the Interstate Commerce Commission, the result of which is now the subject of the plaintiff's complaint, was instituted at the request of the National Mediation Board and participated in by the plaintiff, as No. 6 on the Railway Labor Act Docket of the Interstate Commerce Commission. Hearings were had before Division 3 thereof, and the procedure there followed and the issues there raised, which were submitted on November 18, 1935, can, I think, best be described in the words of the Commission's report, rendered on July 24, 1936: "A hearing has been held at which evidence was introduced by the Hudson & Manhattan, which contends that it is exempt as an interurban electric railroad, and on behalf of the Brotherhood of Railroad Trainmen, the Brotherhood of Locomotive Engineers, the Brotherhood of Railroad Signalmen. of America, and the Railway Employees' Department of the American Federation of Labor. Briefs have been filed on behalf of the above-named parties and the Railway Labor Executives' Association, which joined the other labor organizations in opposing the carrier's contention. The parties waived the issuance of a proposed report by the examiner, and the case was submitted upon oral argument before us."

As a result of the hearing and subsequent deliberations of the Commission, it was decided, for reasons given by the Commission in its report, that the plaintiff did not fall within the exemption proviso of section 1 of the Railway Labor Act, 45 U.S.C.A. § 151, and, therefore, was subject to the provisions of that act.

III. Accordingly, under date of July 28, 1936, the National Mediation Board issued from Washington to the plaintiff, among other carriers, its Order No. 1, which was as follows:

"To the President of each Carrier coming under the Railway Labor Act:

"There is enclosed herewith sample copy of 'Notice in re Railway Labor Act' (Form MB–1, standard as to contents, dimensions of sheet, and size of type), prescribed by the National Mediation Board pursuant to Section 2, Eighth, Railway Labor Act [45 U.S.C.A. § 152, subd. 8], to be printed and used by each carrier, respectively, in notifying its employees that all disputes between the carrier and its employees will be handled in accordance with the requirements of the Railway Labor Act and that contracts of employment will be governed by said Act.

"Such notices shall be posted within fifteen (15) days from the date of this order and maintained continuously in readable condition on all the usual and customary bulletin boards giving information to employees and at such other places as may be necessary to make them accessible to all employees, such notice not to be hidden by other papers or otherwise obscured from view.

"Acknowledgment of this order, together with a copy of the notices printed for use on your railroad, shall be sent forthwith to the National Mediation Board, Washington, D. C.

"By direction of the Board,

"James W. Carmalt

"Chairman, National Mediation Board"

IV. On October 5, 1936, a petition for a reargument before the full Commission of the proceeding for the plaintiff's exemption from the Railway Labor Act was denied at a general session thereof.

V. This court's jurisdiction of the subject-matter herein is based on the fact that this cause is a controversy arising under the laws of the United States, admittedly involving penalties in excess of $3,000, exclusive of interest and costs. 28 U.S. C.A. § 41(1).

The first question to be considered is in what kind of forum this jurisdiction should be exercised. A three-judge court is, of course, unnecessary under title 28 U.

S.C.A. § 380a, on the ground that it is sought to enjoin the enforcement of an act of Congress on constitutional grounds, because, though raised in the pleadings, the constitutional question has been abandoned and is not pressed before me.

Nor do I think a three-judge court is necessary under title 28 U.S.C.A. § 47, on the ground that a determination of the Interstate Commerce Commission is being challenged. For a "determination" by the Interstate Commerce Commission has not, by itself, any more status as a juristic act than the verdict of a jury or the opinion of a court, which, alike, mean only that by reason of the facts shown a foundation exists for such an act; and unless and until a juristic act is achieved by the entry of an order, judgment or decree—whatever may be the name given to such act in the particular tribunal, judicial or administrative, which may be involved— the proceeding, however elaborate or protracted, is still legally inconclusive, and the parties thereto are still at large. Reed v. Proprietors of Locks, etc. on Merrimac River, 8 How. 274, 290, 291, 12 L.Ed. 1077; Smith v. McCool, 16 Wall. 560, 561, 21 L. Ed. 324; United States v. Atlanta, Birmingham & Coast R. R. Co., 282 U.S. 522, 528, 530, 51 S.Ct. 237, 239, 75 L.Ed. 513; and Atlanta, B. & C. R. Co. v. U. S., 296 U.S. 33, 36, 56 S.Ct. 12, 13, 80 L.Ed. 25.

In this cause the formal juristic act embodying the "determination" of the Interstate Commerce Commission is to be found not in an order of the Commission, but in the above-quoted order of the National Mediation Board of July 28, 1936.

The fact that the federal courts are constitutionally or by statute courts of limited jurisdiction as to subject-matter, and that their composition is prescribed by statute, makes it obvious to me that a three-judge court would not be a proper forum herein, for there is not any provision in the Judicial Code for the convening of such a court when an order of the National Mediation Board is challenged, as it is in this cause.

Therefore, I agree with the decision, dated August 16, 1937, in the case of Shannahan et al., Trustee, v. United States, D.C., 20 F.Supp. 1002, wherein a three-judge court, assembled in the Northern District of Indiana, held that it was without jurisdiction to deal with a "determination" of the Interstate Commerce Com-

mission regarding the Chicago, South Shore & South Bend Railroad—214 I.C.C. 167—similar to the determination in this cause, on which an order of the National Mediation Board has, as here, been entered; and also with the decision—also unreported—in the district of Utah of the Utah Idaho Central Railroad Company v. Dan B. Shields and the Interstate Commerce Commission,[1] in which Judge Johnson sat alone and granted relief similar to that here sought.

VI. The questions here involved are whether the plaintiff's status in the railway world is such as to bring it within the administrative jurisdiction of the National Mediation Board, and whether the administrative jurisdiction over the plaintiff, which has been sustained by the Commission, may be challenged in court on the ground that the Commission drew an erroneous conclusion of law from its findings of ultimate fact which the plaintiff admits were arrived at after due hearing and are supported by adequate evidence.

VII. These conclusions of ultimate fact as found by the Commission herein, Hudson & Manhattan Railroad Company, Railway Labor Act Docket No. 6, 216 I.C.C. 745, 746–751, are as follows:

"It is not disputed that the Hudson & Manhattan is a carrier by railroad subject to the Interstate Commerce Act [49 U.S. C.A. § 1 et seq.], except such sections thereof as contain exemptions somewhat similar to that here under consideration: This carrier is operated with electric power, and so far as known, none of its securities is owned by any steam railroad operating in the same territory. The only issue is whether the carrier is an independently operated interurban within the meaning of the proviso. The request that we determine this question followed the service of an order by the National Mediation Board and the carrier's denial of that board's jurisdiction.

"The Hudson & Manhattan operates an underground railroad for the transportation of passengers between stations on Manhattan Island in New York City, N. Y., and stations in Jersey City and Hoboken, N.J., together with a surface extension operated jointly with the Pennsylvania Railroad Company to and from Newark, N. J. It has two double-track lines under the Hudson River, one known as the downtown line and the other as the uptown line, which are

---

[1] Affirmed in 95 F.2d 911.

connected on the New Jersey side. Altogether this carrier operates 8.5 miles of double-track line and 20.3 miles of track, including sidings and yards but not 5.71 miles of double-track line of the Pennsylvania used in the joint service to and from Newark. All of the Hudson & Manhattan lines are underground except 0.63 mile in an open cut and its car-storage yard, both of which are leased from the Pennsylvania. Approximately 40.4 percent of the tracks are under public streets, 36.7 percent under private property, and 22.9 percent under the Hudson River. The company has about 1,-300 employees engaged in railroad operation and 300 engaged in non-railroad operations.

"The downtown line starts from the Hudson Terminal which is located beneath the streets and two large office buildings owned by the carrier in the square bounded by Church, Fulton, Greenwich, and Cortlandt Streets in the financial district of lower Manhattan. At or near this terminal, connections can be made with several New York subway and elevated lines. From here the line extends westward under the streets and the river to a station 80 feet beneath the Pennsylvania's passenger terminal at Exchange Place, near the water front in Jersey City. Elevators there convey passengers to and from the Pennsylvania's station, as well as the street, where there is a trolley and bus terminal. From Exchange Place the line continues westward, mainly under the Pennsylvania's right-of-way to a station at Journal Square in the central business district of Jersey City. This station is located in an open cut a short distance beyond the tunnel portals, and escalators convey passengers to and from the street, where there is a terminal for trolley lines and bus routes, both local and long distance. The Pennsylvania owns this station, but it is operated by the Hudson & Manhattan, and both lines use it jointly.

"The uptown line starts from a terminal beneath the streets at Thirty-third Street and Sixth Avenue in the midtown shopping district of New York. From there it extends in a southerly direction under Sixth Avenue to Christopher Street, thence southwesterly under the latter street and the river to Hoboken. There are six stations on this line in New York besides that at Third-third Street, and connections can be made with various subway, elevated, and surface lines. At Fifteenth Street in Ho-

boken the line divides, one branch going north to the passenger station of the Delaware, Lackawanna & Western Railroad Company, hereinafter called the Lackawanna, and the other turning south to the passenger station of the Erie Railroad Company in Jersey City, and thence continuing south to a connection with the downtown line. Passageways and stairways connect the Hudson & Manhattan stations with those of the Lackawanna and the Erie, and elevators or escalators also lead to the street where there are trolley lines and busses. That part of the line in Hoboken and Jersey City is located largely under the terminal yards of the trunk-line railroads.

"The Hudson & Manhattan tunnels are more or less similar in size to those of the New York subways, and they are too small for standard steam-railroad passenger cars. They are equipped with automatic block signals, each with an automatic train stop, and terminals and junctions are protected with interlocking equipment. Eighty-five-pound rails are used on short ties of special subway type, and the tracks are either ballasted or concreted. Power rail is also installed throughout the system. The grades are numerous and severe, reaching a maximum of 5.46 percent, and the curves are numerous and long with a minimum radius of 90 feet. The grade and curve conditions are such that there is practically no level straight track in the system.

"This carrier owns 324 passenger cars which were designed for its small-size tunnels. They are of steel construction, with longitudinal seats accommodating 44 passengers, and have self-contained motors and sliding doors. They are not operated singly but in trains ranging up to eight cars. The trains are operated on an interval schedule, ranging from 90 seconds during rush hours to 30 minutes after midnight. There are four local train routes as follows: Between the Thirty-third Street Terminal in New York and the Hoboken Terminal, between the Thirty-third Street Terminal and Journal Square in Jersey City, between the Hudson Terminal and Journal Square, and between the Hudson Terminal and the Hoboken Terminal.

"The joint service to and from Newark is performed over a double-track surface line of the Pennsylvania between the Journal Square station in Jersey City and a station owned and operated by the Pennsylvania at Park Place in Newark. At Man-

hattan Transfer this line intersects the main line of the Pennsylvania, which is also used by the Lehigh Valley Railroad Company to and from the Pennsylvania Station in New York. Through trains are operated in a so-called rapid-transit service between the Hudson Terminal in New York and the Park Place station in Newark. Passengers on these trains may transfer to or from the uptown line where it connects with the downtown line in Jersey City. It is understood that the Pennsylvania also operates trains over that portion of the joint route between Journal Square and Manhattan Transfer, but the line from Manhattan Transfer to Park Place, and the terminal there, were built by the Pennsylvania for the rapid-transit service and are used exclusively in that service. The Pennsylvania has recently constructed a new passenger station at Market Street in Newark, which is used by its main-line trains, and a contract has been made to change the rapid-transit service to that station, but the change had not been effected at the time of the hearing.

"The contract between the Pennsylvania and the Hudson & Manhattan's predecessors, referred to as the tunnel companies, provided that they would employ the motormen, conductors, and other joint employees required in connection with the operation of the through service in proportion to the length of their respective lines used in such service. It further provided, however, that:

" 'The Tunnel Companies shall, acting as well for and on behalf of the Pennsylvania Company as for themselves employ the motormen, conductors, and other joint employes required in connection with the operation of such through electric train service, until the Pennsylvania Company shall, by giving twelve months' notice, advise the Tunnel Companies of its intention to exercise the right and privilege conferred by the provisions of this article, to employ its proportion of the said employes by its own officers or other agency; but with the approval of the Pennsylvania Company, the Tunnel Companies may at any time resume the privilege of appointing such employes, subject to termination upon like notice.

" 'All employes so appointed by the Tunnel Companies for and on behalf of the Pennsylvania Company and their continuance on such through electric train service shall be subject to the approval of the Pennsylvania Company.'

"Pursuant to the above-quoted provision the Hudson & Manhattan employs all of the joint employees, and their wages are borne in the proportions of approximately 40 percent by it and 60 percent by the Pennsylvania. These percentages are approximately the proportions of the through route represented by the lines of the respective companies embraced therein, the Hudson & Manhattan contributing 3.2 miles, and the Pennsylvania 5.71 miles, of the through route. Approximately 10 percent of the Hudson & Manhattan's employees are engaged in the joint service. The following, quoted from the carrier's brief, shows some of the conditions affecting the joint employees:

" 'In respect to the joint rapid transit train service, all employees are under the direct supervision and control of, and report to, the Hudson & Manhattan Railroad Company as to the portion of the route between Hudson Terminal, New York, and Journal Square, New Jersey; but from Journal Square Station to Park Place, Newark, all employees in the joint service trains are under the direct supervision, control, and report to the Pennsylvania Railroad Company, and, therefore, employees on the trains between Journal Square and Park Place, Newark, are required to pass the physical examinations of, and make reports to, the Pennsylvania Railroad Company, and to be familiar with the rules and regulations of that Company governing train operation, collection of tickets, reports to be filed in respect thereto, and all matters of train service operation.'

"The two carriers also furnish the same proportions, as above mentioned, of the 112 cars used in the joint service, which are of a small rapid-transit type. Because these cars are narrower than standard steam-railroad passenger cars, special tracks had to be provided for them at Manhattan Transfer to bring them close enough to the platforms. Originally the contract provided for the repair of this equipment by the Pennsylvania, but it is now repaired by the Hudson & Manhattan and the expense divided on the 40–60 basis. Each carrier maintains its own part of the through route and assumes responsibility for accidents occurring thereon.

"Before the Hudson & Manhattan was constructed, the only way in which trunk-line passengers could cross the Hudson River to or from New York was on ferry boats operated by the various railroads.

Commencing in 1903, this carrier and its predecessors entered into a series of contracts with the Pennsylvania regarding the carriage of the latter's passengers to and from New York. The Hudson & Manhattan is now a party to 15 tariffs published by the Pennsylvania, under which passengers of the latter holding tickets to or from New York may transfer to or from the Hudson & Manhattan without additional charge. The Hudson & Manhattan is also a party to one passenger tariff of the Lehigh Valley, under which there is a similar arrangement. Passengers on the main line of the Pennsylvania and the Lehigh Valley transfer at Manhattan Transfer, while passengers on Pennsylvania suburban trains which operate into its Exchange Place station in Jersey City change there. The Pennsylvania's time tables show the train schedules to and from the Hudson Terminal as well as its own station in New York. The Pennsylvania maintains a ticket office in the Hudson Terminal, where tickets may be purchased to any point on or reached via its lines.

"The Hudson & Manhattan charges a local fare of 5 cents per passenger for transportation intrastate in New York and intrastate in New Jersey. Its local fares for interstate transportation are 6 cents between the Hudson Terminal and New Jersey stations and 10 cents between stations in New York on the uptown line and New Jersey stations. These interstate fares were approved in lieu of the fares proposed in Local Fares on Hudson & M. R. Co., 58 I. C.C. 270. The fares charged in the joint rapid-transit service between New York and Newark are 33 cents one way and 40 cents for a limited round trip. The Hudson & Manhattan receives agreed divisions from the Pennsylvania on all passengers handled jointly, both to or from Newark and to or from other points on or reached via the Pennsylvania. These divisions are 5 cents where the passenger is transported only between the Hudson Terminal and the Exchange Place station, 7.64 cents on all other passengers transported to or from the Hudson Terminal, and 8.64 cents on passengers transported to or from stations in New York on the uptown line. The divisions with respect to Lehigh Valley passengers handled by the Hudson & Manhattan are received through the Pennsylvania. The Hudson & Manhattan receives no division of the fares paid by passengers traveling only on the Pennsylvania's portion of the joint rapid-transit route.

"All local fares are collected by depositing cash in coin boxes at the station entrances or exits. This includes the fares paid by passengers of the Lackawanna and the Erie with which the Hudson & Manhattan has no joint fares. Tickets are sold for the joint service to and from Newark by both the Hudson & Manhattan and the Pennsylvania, in each instance for the through trip and showing only the name of the issuing carrier. Passengers on the main line of the Pennsylvania or Lehigh Valley who desire to reach downtown New York are given a transfer ticket by the conductor before reaching Manhattan Transfer, and this is collected by the conductor on the joint rapid-transit train. Pennsylvania commutation tickets and mileage books are honored by both carriers without transfers. The Hudson & Manhattan conductors are furnished punches which register the number of trunk-line passengers and thus enable the amount due that carrier to be determined. All punching and collecting of tickets is performed on that portion of the joint rapid-transit route owned by the Pennsylvania, except that the gatemen at the Hudson Terminal examine and punch the tickets of outgoing joint passengers.

"An analysis of the passenger traffic handled by the Hudson & Manhattan during the five years ending December 31, 1934, shows that 98.25 percent of its passenger revenue was derived from interstate passengers, 1.3 percent from New Jersey intrastate passengers, and 0.45 percent from New York intrastate passengers. It further shows that 77.03 percent of the total passenger revenue was derived from local fares, while 22.97 percent was derived from joint fares with the Pennsylvania. The local-fare traffic includes about one-half of the Lackawanna and the Erie passengers, who use the Hudson & Manhattan to complete their journey to or from New York, the rest using the ferry service which is included in the trunk-line fares. The passengers boarding the Hudson & Manhattan at the Lackawanna and Erie stations are about evenly divided as between trunk-line passengers and others. Less than 10 percent of the passengers handled on joint fares with the Pennsylvania were destined to points on or reached via its main line. Only 1.74 percent of the total passenger traffic was delivered to or received from the Pennsylvania

at Exchange Place. The downtown line handled twice as many local passengers and three times as many joint passengers as the uptown line. A total of 75,523,651 joint-fare passengers were handled to or from the Hudson Terminal during the 5-year period, or an average of over 40,000 per day.

"During the same 5-year period the Hudson & Manhattan derived 65.79 percent of its total revenue from railroad operation, 26.08 percent was from nonrailroad operations, such as the rental of its Hudson Terminal office buildings, and 8.13 percent was nonoperating income. Although the contracts show that it was originally intended that the Hudson & Manhattan would handle the Pennsylvania's baggage and express as well as passengers and mail, no express is handled nor is any baggage checked by this carrier. First-class and registered mail is handled between the Hudson Terminal post office and the Journal Square station under a contract with the Government, which pays the Hudson & Manhattan $23,346 per annum for this service. Beyond Journal Square the mail continues on the same trains over the Pennsylvania's portion of the joint-service route and is transferred to or from that carrier's main-line trains at Manhattan Transfer. No freight is handled by the Hudson & Manhattan."

VIII. Although these findings of fact are not attacked in any way, the determination made by the Commission therefrom is said by the petitioner to be wholly wrong, and to involve the decision of what may conveniently—although perhaps not quite accurately, cf. Crowell v. Benson, 285 U.S. 22, 54, 52 S.Ct. 285, 293, 76 L.Ed. 598—be called a question of administrative jurisdiction which is judicially reviewable by the courts under the teachings of the case just mentioned, and of United States v. State of Idaho, 298 U.S. 105, 109, 56 S.Ct. 690, 692, 80 L.Ed. 1070.

Such questions are of importance now, and will, I imagine, increase in importance with the expectable growth of administrative law as part of our jurisprudence.

It seems to me that, subject to its observance (1) of the amenities of due process, namely, "according a fair hearing and acting upon evidence and not arbitrarily"— St. Joseph Stock Yards Company v. United States, 298 U.S. 38, 51, 56 S.Ct. 720, 725, 80 L.Ed. 1033—and (2) of the ambit of its administrative jurisdiction—cases just cited—an administrative board is free of judicial review in its fact finding unless the mandate given to it by the Legislature in some way limits it therein.

Here the mandate to the Commission reads as follows: "The Interstate Commerce Commission is hereby authorized and directed . upon request of the Mediation Board or upon complaint of any party interested to determine whether any line operated by electric power falls within the terms of the proviso."

This puts the jurisdiction and, perhaps, I might add, also the venue, of such determination in the Commission, and—because in my opinion there is not any question of due process properly raised herein—under familiar authorities, I should be precluded by this broad mandate from looking behind that determination, if the plaintiff had not raised a question of what I have called administrative jurisdiction based on the claim that the Commission came to an erroneous conclusion of law, when it held that the plaintiff—an electric railway and geographically interurban—had not made out a case for exemption from the Railway Labor Act, and the National Mediation Board was thus unjustifiably given administrative jurisdiction over it.

IX. The novelty of arrangement involved in the Railway Labor Act, as amended, 45 U.S.C.A. § 151 et seq., is that the "determination" of the administrative jurisdiction of the National Mediation Board, created thereunder, over the railways mentioned in the proviso, is left to another administrative body—not inappropriately—the Interstate Commerce Commission. Also under identic phrases, the determination of the administrative jurisdiction involved under two later Acts of August 29, 1935, the Railroad Retirement Act of 1935, 49 Stat. 967–973, title 45 U.S.C. §§ 215–228 note; and the Tax on Carriers and Employees Act, 49 Stat. 974–977, title 45 U.S.C. §§ 241–253 note, is left to the Commission, thus making it reasonably inferable that the Congress hoped in this way to avoid conflicting rulings on the ambit of administrative jurisdiction under these three statutes, which are all concerned from different points of view with railways.

The difficulty of maintaining this theoretically admirable objective is that the mandate to the Commission under each statute is to decide, in each case which comes before it thereunder, a question of

the applicability of the particular statute involved to a particular railway.

For, whilst the question whether the plaintiff is or is not an interurban electric railway not operating as a part of a general steam railroad system of transportation obviously is initially a question of fact, when a finding thereon is made by the Commission, it becomes transmuted—by reason of the point at which the finding impinges on the situation under consideration—into what is sometimes called a "mixed question of fact and law," cf. United States v. State of Idaho, 298 U.S. 105, 109, 56 S.Ct. 690, 692, 80 L.Ed. 1070, which juristically has the same status as a question of law, because when it is embodied in an order of the National Mediation Board it involves the determination of a fact which decides the applicability of the Railway Labor Act to the plaintiff; a question of administrative jurisdiction.

X. As the criteria herein applicable to show the incorrectness of the Commission's determination, the plaintiff invokes the criteria which it says were applied not only by the Commission itself in other cases, but also by the Supreme Court in two cases of interstate railways claimed to be interurban, in the first of which, Piedmont & Northern Railway Company v. Interstate Commerce Commission, 286 U.S. 299, 52 S.Ct. 541, 76 L.Ed. 1115, the claim was denied, and in the second of which, United States v. Chicago North Shore & Milwaukee Railroad, 288 U.S. 1, 53 S.Ct. 245, 77 L.Ed. 583, the claim was sustained.

Judged in the light of those criteria, the petitioner claims that by reason of the Commission's determination of ultimate facts a decree for it is inevitable herein.

Because it involved a decision that the railway in question was an interurban electric railway as defined in section 1 of the Railway Labor Act, 45 U.S.C.A. § 151, the case principally stressed by the plaintiff on the merits of its cause is United States v. Chicago North Shore & Milwaukee Railroad, 288 U.S. 1, 53 S.Ct. 245, 77 L.Ed. 583, which seems to have been somewhat reluctantly followed by the Interstate Commerce Commission in determining the status of that railroad under the Railway Labor Act. Chicago North Shore & Milwaukee Railroad Company, Railway Labor Act Docket No. 7, 219 I.C.C. 135.

XI. Because of the administrative jurisdictional question involved, I am entitled to examine the Commission's findings in its report as if they were special findings of fact by a jury, and to determine what legal result properly should be predicated thereon.

In connection with this jury analogy, however, I here remark—parenthetically—that if I had before me a jury's special verdict I should also have before me the evidence to support its special findings, and so I should have a more satisfactory basis of decision than facts refracted, as here, through the medium of other minds and embodied in informal findings of another tribunal can possibly ever give me. It seems to me, therefore, regrettable—although wholly understandable in view of the plaintiff's position herein—that I have not before me the record which was before the Commission.

The decisions of the Supreme Court in the two cases just mentioned do not, I think, help me much in deciding the question of fact which I have to decide here, except, perhaps, as showing the technique of approach to my decision.

For the situation of the plaintiff here is admittedly unique from the point of view of its locale, as shown by the map annexed to the complaint; of its principal function as an interurban passenger carrier; and of its relationship, geographically and contractual, with at least one steam railroad system of transportation, the Pennsylvania Railroad.

XII. The final conclusion reached by the Commission is that the Hudson & Manhattan Railroad Company is not "a mere interurban as that term is used in the exemption proviso under consideration," and that, therefore, it does not fall within the exemption of the first paragraph of section 1 of the Railway Labor Act, as amended June 21, 1934, 45 U.S.C.A. § 151, par. 1.

Thus, in effect, the Commission found that the plaintiff had not maintained the burden of proof cast on it to show that it falls within the terms of the proviso. A finding so phrased implicitly recognizes how nice is the question of the plaintiff's status now before me.

XIII. On an independent examination of the facts which I am entitled to make, for the reasons above stated, I think that this somewhat inconclusively phrased determination by the Commission was erroneous.

It seems to me that the master facts in this case are that the Hudson & Manhattan Railroad Company and the Pennsylvania Railroad are entirely independent companies, that the Hudson & Manhattan Railroad is not directly or indirectly owned by the Pennsylvania Railroad, in whole or in part, and is not under the control or management of the Pennsylvania Railroad by means of interlocking directorates or otherwise, as was the case in respect of another passenger carrier which operated standard railroad equipment and was recently held not within the exemption under discussion here. New York, Westchester & Boston R. R., Railway Labor Act Docket No. 5, 218 I.C.C. 253.

The plaintiff's cars are not of standard railway type, but are specially built small enough to go through its tunnels, and each car has seats and doors substantially like those of the New York subways.

The master fact situation, just referred to, has been regarded by the Commission as having been modified fatally to the plaintiff's contention because through electric passenger trains of the type described are run from the Hudson Terminal to Newark, going over the tracks of the Hudson & Manhattan Railroad Company from the Hudson Terminal to Journal Square, Jersey City, and thence over tracks owned by the Pennsylvania Railroad and built for the purpose of this service, to Newark; but ultimately it is, as nearly as possible in proportion to the mileage of track owned by each railroad which is traversed by these trains in passing from Hudson Terminal to Newark, that the earnings from this service are divided between the two railroads and the expenses of its equipment and operation are severally borne by them.

Even allowing that there is the almost negligible percentage of at most 4 per cent. of the passengers who use this service—2 per cent. coming from and 2 per cent. going to New York—for connection with the main line Pennsylvania trains or trains of the Lehigh Valley Railroad, the whole service is essentially a rapid transit interurban passenger service between New York City and Newark, and the railroad passengers carried are about as incidental to this interurban service as similar passengers carried by the Interborough Rapid Transit Company to and from the Grand Central Station are to that company.

It is difficult, therefore, to see why, for any of the reasons given by the Commis-sion, the plaintiff as a mere participant in such a service with such equipment, should not be held to be within the exemption proviso under discussion.

Furthermore, the Hudson & Manhattan Railroad Company does not carry any freight, any express, or any checked luggage, although, apparently, the first contracts—referred to in the report of the Commission—between it and the Pennsylvania Railroad contemplated its carrying both express and checked luggage. It does, however, carry first class and registered mail, which it turns over to the Pennsylvania Railroad, for the transportation whereof it is separately paid direct by the United States Post Office Department.

The mere fact that the Pennsylvania Railroad maintains a ticket office in the Hudson Terminal Building, which is owned by the plaintiff and is the source of part of its income, does not make that building a passenger terminal of the Pennsylvania Railroad, for that any place may properly be called a passenger terminal where luggage cannot be checked for transportation is almost inconceivable.

The so-called joint tariffs between the plaintiff and the Pennsylvania Railroad and the Lehigh Valley Railroad, and the time-tables showing the latest times at which trains leaving the New York end of the Hudson & Manhattan Railroad will connect with the trains of those railroads, or coming in the opposite direction, will arrive in New York City at the downtown or uptown end of the plaintiff's line, are mere conveniences to the public, and are not, in my opinion, sufficient in view of the circumstances above noted, to offset the fact that ownership or control, direct or indirect, of the plaintiff by the Pennsylvania Railroad—or vice versa—does not exist, and that the percentage of passengers carried by the Hudson & Manhattan Railroad Company, which uses the Pennsylvania Railroad, or the Lehigh Valley Railroad, is so very inconsiderable.

In this connection, it may not be without significance that in the first part of section 1 of the Railway Labor Act, 45 U.S.C.A. § 151, the kind of companies ancillary to railroads, such, for example, as elevator companies, refrigerating companies, storage companies, etc., included within the scope of the act are those "directly or indirectly owned or controlled by or under common control with any carrier by railroad."

There is an argument put forward by the Commission as to the complications which might result if the same employees in the interurban service above described were subject to the Railway Labor Act whilst on the rails of the Pennsylvania Railroad and exempt therefrom whilst on the rails of the Hudson & Manhattan Railroad. This is an argument ab inconvenienti which does not appeal to me, and certainly does not contribute any strength to the Commission's opinion that the plaintiff railroad is within the administrative jurisdiction of the National Mediation Board; for certainly the situation just mentioned could be remedied by appropriate contracts.

There is not any administrative history, it seems to me, as to the position taken by the government on the status of the plaintiff under other similarly-worded exemptions which is really persuasive herein, one way or the other, as there was, for example, in United States v. Chicago North Shore & Milwaukee R. R., 288 U.S. 1, 53 S. Ct. 245, 77 L.Ed. 583.

XIV. I have had submitted to me the findings of fact and conclusions of law in the case of Utah Idaho Central Railroad Company v. Dan B. Shields, United States Attorney, and Interstate Commerce Commission, Intervenor,[1] signed by Judge Johnson on October 15, 1936, and having the docket number, Equity No. 12924, in the clerk's office for the district of Utah. This is a case similar to the instant cause in many of its practice aspects, but different herefrom on its merits, because there the record before the Interstate Commerce Commission was put in evidence before the court, and did not, in the opinion thereof, support the conclusion of the Commission.

Accordingly, the Utah Idaho Central Railroad was held to be an interurban electric railway within the exemption of section 1 of the Railway Labor Act, 45 U.S.C. A. § 151,—although under the Locomotive Boiler Inspection Act, which contained in section 1, as amended June 7, 1924, 45 U.S. C.A. § 22, an exemption proviso identic to that herein involved, it had previously been held by the Commission not to be an interurban electric railway, Rules and Instructions for Inspection and Testing other than Steam Power Locomotives, 122 I.C.C. 414— and a permanent injunction was issued against the United States Attorney for Utah.

XV. The defendant, as United States Attorney for the Southern District of New York, admits in his answer that he will perform the duty imposed upon him by the tenth paragraph of section 2 of the Railway Labor Act, as amended, 45 U.S.C. A. § 152, par. 10, and will institute criminal proceedings against the plaintiff, or its officers or agents for alleged violation of the provisions of the act in order that he may enforce the collection of the heavy and rapidly accumulating penalties prescribed by said tenth paragraph, section 2 of the act, for failure to comply therewith, and further admits that there is not for the plaintiff any adequate remedy at law to prevent irreparable damages and injuries to it.

These admissions make the interposition herein of injunctive relief by an equity court appropriate. E. g. Carter v. Carter Coal Company, 298 U.S. 238, 287, 56 S.Ct. 855, 862, 80 L.Ed. 1160.

XVI. I find, therefore, that on what I regard as a proper construction of the ultimate facts here shown, the plaintiff is an interurban electric railway not operating as a part of a general steam railroad system of transportation, and, consequently, entitled to the relief herein prayed.

XVII. This opinion shall stand as the findings of fact and conclusions of law required under Equity Rule 70½, 28 U.S.C. A. following section 723, and an order so providing must be embodied in the decree which is entered in this suit. Cf. Stelos Company v. Hosiery Motor-Mend Corporation, D.C., 60 F.2d 1009, 1013; Id., 2 Cir., 72 F.2d 405; Id., 295 U.S. 237, 55 S.Ct. 746, 79 L.Ed. 1414.

Unless agreed as to form, the decree herein must be settled on three days' notice.

---

1 Affirmed in 95 F.2d 911.