**In the Matter of HUDSON & MANHATTAN RAILROAD COMPANY, Debtor.**

No. 90460.

United States District Court, S. D. New York.

Dec. 1, 1954.

House, Grossman, Vorhaus & Hemley and Edward M. Garlock, New York City, for petitioning creditors, Edward M. Garlock, New York City, of counsel.

Rosenman, Goldmark, Colin & Kaye, New York City, for debtor, Godfrey Goldmark, Harold I. Kahen, Gerald D. Roth, New York City, of counsel.

WALSH, District Judge.

Reorganization of the debtor has been sought by certain creditors under Chapter X of the Bankruptcy Act, 11 U. S.C.A. § 501 et seq., and by the debtor itself under Section 77 of that act, 11 U.S.C.A. § 205. It is my conclusion that the defendant is an interurban electric railway; that it is not operated as part of a general railroad system of transportation; and that it does not derive more than 50% of its operating revenue from freight. Consequently, Chapter X, rather than Section 77, is the statute applicable to its reorganization. The debtor's motion to dismiss the Chapter X proceeding and its application for approval of the Section 77 proceeding are denied.

The debtor furnishes electric rapid transit service from Hoboken, Jersey City and Newark, New Jersey to its downtown terminal in the City of New York, and to a chain of underground stations between Christopher Street and 32nd Street in midtown New York. Its New Jersey stations are convenient to the terminals of the Delaware, Lackawanna & Western in Hoboken, the Erie in Jersey City, and the Pennsylvania in Newark and Jersey City. It operates 8.5 miles of double track line of its own and 5.7 miles of double track owned by the Pennsylvania. Its service is entirely electrified. Its tracks and those of the Pennsylvania upon which it operates, are used by it exclusively and do not have any interconnection with the tracks used by any other railroad. Its cars are of the multiple unit type commonly used on rapid transit systems, similar to those used on the New York subways, and smaller than the standard general railway cars. Although some of the cars which it regularly operates on its own line are owned by the Pennsylvania, the debtor has the exclusive use of these cars; it does not interchange equipment with any other railroad. It carries no freight. Its securities are not held by any other railroad. Its management appears to be completely independent.

By the terms of Section 106(3), Chapter X is not available to a corporation which may be reorganized under Section 77. 11 U.S.C.A. § 506(3). Section 77 in turn describes such a corporation as:

" * * * any common carrier by railroad engaged in the transportation of persons or property in interstate commerce, except a street, a suburban, or interurban electric railway which is not operated as a part of a general railroad system of transportation or which does not derive more than 50 per centum of its operating revenues from the transportation of freight in standard steam railroad freight equipment. * * *." 11 U.S.C.A. § 205, sub. m.

Inasmuch as the debtor transports no freight, the question is whether it is excluded from Section 77 and hence included under Chapter X because it is an interurban electric railway not operated as part of a general railroad system.

Debtor is an interurban electric railway. It furnishes rapid transit service of the nature ordinarily furnished by street railways between New York and neighboring communities. Its lack of freight business, its lack of standard railroad equipment, and its lack of interconnection with the tracks of any other railroad mark it as an interurban railroad. Piedmont & Northern Ry. Co. v. Interstate Commerce Commission, 286 U.S. 299, 307, 52 S.Ct. 541, 76 L.Ed. 1115; U. S. v. Chicago, N. S. & M. R. Co., 288 U.S. 1, 10, 53 S.Ct. 245, 77 L.Ed. 583.

Debtor's contracts with the Pennsylvania do not constitute it a part of the Pennsylvania's general system. To avoid exclusion from Section 77 it would be necessary to find not merely that the debtor is part of the national system of transportation but that it is part of a particular railroad's system. In re Chicago, N. S. & M. R. Co., 7 Cir., 131 F.2d 458, certiorari denied Reed v. Chicago, N. S. & M. R. Co., 318 U.S. 768, 63 S.Ct. 762, 87 L.Ed. 1139; Public Service Commission v. U. S., D.C.S.D. N.Y., 56 F.Supp. 351, 354, affirmed 323 U.S. 675, 65 S.Ct. 130, 89 L.Ed. 548.

There are two basic contracts. One, entered into in 1903, granted the debtor an easement under the Pennsylvania's terminal at Exchange Place, Jersey City in return for the debtor's agreement to furnish prompt transportation for the Pennsylvania's passengers to New York. At that time Exchange Place was the easterly terminal of the Pennsylvania's system, connected with New York City by ferry and the debtor was constructing its line through Jersey City to Hoboken with stations adjacent to the terminals of the Erie and the Lackawanna. Under this contract Pennsylvania passengers have had free transfer rights at Exchange Place and the Pennsylvania has

paid an agreed amount to the debtor for their carriage. Although the main line of the Pennsylvania has been extended to the Pennsylvania terminal in the City of New York, many commuting trains from New Jersey communities still end their runs at Exchange Place so that a substantial number of Pennsylvania passengers still take advantage of its contract with the debtor.

The second contract was entered into in 1906, at a time when the debtor contemplated extending a new line from Exchange Place to Newark, substantially parallel to already existing lines of the Pennsylvania. Pursuant to this contract the extension was jointly developed with the Pennsylvania. The debtor extended its lines from Exchange Place to Journal Square in Jersey City and the Pennsylvania has provided the track and power from Journal Square to Newark. Both roads sell tickets for the New York-Newark run. Transfers were provided to permit Pennsylvania passengers to ride over this line to the debtor's downtown terminal, and the debtor's trains from Newark were shown on the Pennsylvania timetables. The revenues and expenses from its operation are divided in the same ratio as the track, approximately 60% to the Pennsylvania, and 40% to the debtor. The Pennsylvania has also provided 60% of the cars used in this service but they are built to the same rapid transit pattern as the other cars used by the debtor. They are not interchangeable with the equipment which the Pennsylvania uses as a carrier. The Newark line has been operated by the debtor but the Pennsylvania has reserved control over rates and train rules and it has reserved the right to pass upon the employees of the debtor who were employed for work over its tracks.

Under both contracts, the debtor derives from the Pennsylvania's passengers one-fifth of its revenue and it carries approximately one-third of the Pennsylvania's total passengers into New York. These Pennsylvania passengers are virtually all commuters from nearby Jersey communities. The number of the Pennsylvania's main line passengers who transfer at Newark is negligible.

Although these two contracts are important to both railroads, they cannot be said to bring either road into the other's system. None of the factors specified in Public Service Commission v. U. S., D.C. S.D.N.Y., 56 F.Supp. 351, 354, are present here. There, interpreting the identical language of Interstate Commerce Act, § 1(22), 49 U.S.C.A. § 1(22), it was held that the test to determine whether one road was in another's system was "a practical one of operation of the railroad", and the basic factors to be considered were: (1) interconnection of physical facilities; (2) intertwining of railroad operations, including personnel as well as equipment; and (3) unity of financial and fiscal functions. Here neither party claims that the Pennsylvania controls or participates in the debtor's management. There is no physical interconnection of track. There is no exchange of equipment; the equipment used by the debtor is completely separate from that used by the Pennsylvania. There is no interchange of employees in the usual sense; the debtor does not use any of the officers or employees of the Pennsylvania in any capacity. There is no financial or fiscal unity of the two roads.

There has been no uniform interpretation of this statutory language with respect to the debtor. It is similar to that found in several sections of the Interstate Commerce Act, the Railway Labor Act, and several other acts related to labor. Its application to the debtor as well as to other railroads has differed in accordance with the differing purposes of the various statutes involved. Generally under acts related to labor and employee safety the exclusion from federal administrative control has been construed more narrowly than under the provisions of the Interstate Commerce Act relative to fiscal matters. In Hudson & M. R. Co., 216 I.C.C. 745, sustained in Hudson & M. R. Co. v. Hardy, 2 Cir., 103 F.2d 327, certiorari denied, Hudson & M. R. Co. v. Cahill, 307 U.S. 640, 59 S.Ct. 1038, 83

L.Ed. 1521, the debtor was held not excluded by similar language in the Railway Labor Act.[1] Since then it has acquiesced in similar treatment under other acts related to labor, including the Railroad Retirement Act, 45 U.S.C.A. § 228a; the Railroad Unemployment Act, 45 U.S.C.A. § 351(a); and the Carriers Taxing Act, 26 U.S.C.A. § 1532(a). On the other hand, the Interstate Commerce Commission has never asserted any claim of jurisdiction over the debtor under the similar language in Sections 15a, 19a and 20a of the Interstate Commerce Act, 49 U.S.C.A. §§ 15a, now repealed, 19a and 20a.[2] The Interstate Commerce Commission in its opinion in the Railway Labor Act case recognized the possibility of diverse treatment in this regard. Hudson & M. R. Co., 216 I.C.C. 745, 752.

Under similar circumstances it was held that the reorganization of the Chicago North Shore and Milwaukee Railroad Company should proceed under Chapter X rather than Section 77. That railroad had been held a "typical example of an interurban electric line for passenger service". U. S. v. Chicago, N. S. & M. R. Co., 288 U.S. 1, 10, 53 S.Ct. 245, 247, 77 L.Ed. 583. Subsequently the Interstate Commerce Commission held that it was not an interurban and that it was part of the general railroad system for the purpose of the Railway Labor Act. The District Court and the Court of Appeals, confronted with the narrow basis for review of administrative rulings, sustained its determination. Sprague v. Woll, 7 Cir., 122 F.2d 128, certiorari denied 314 U.S. 669, 62 S.Ct. 131, 86 L.Ed. 535. Nevertheless, the same courts held that the District Court was not compelled to follow this classification under the Bankruptcy Act, and the Court of Appeals affirmed the decision that this railroad should be reorganized as an interurban under Chapter X rather than Section 77. In re Chicago, N. S. & M. R. Co., 7 Cir., 131 F.2d 458, certiorari denied, Reed v. Chicago, N. S. & M. R. Co., 318 U.S. 768, 63 S.Ct. 762, 87 L.Ed. 1139.

◾ Responsibility for reorganization of railroads, like supervision of their securities and valuation of their property, were ancillary powers given to the Commission to aid it in the efficient performance of its ultimate responsibility—providing for a national system of transportation with adequate service at reasonable rates. Although the Commission is charged with responsibility for the rates and service of all interstate railroads, including interurbans, Congress did not require it to perform these ancillary functions with respect to interurbans which were not part of a general railroad system. To have required this would have placed a burden on the Commission for which there would be no commensurate return of national import. Undoubtedly, considering the case of each railroad as an isolated problem, it would always be helpful to take advantage of the expertness of the Interstate Commerce Commission. It would be easy to generalize that because the Commission must ultimately pass upon questions of rates and service it should also, as to every interstate railroad, undertake the time consuming hearings and wrangles incident to its reorganization. But this was not the plan of Congress. The Com-

---

1. The exclusionary language reads as follows:
   " * * * *Provided, however, That the term 'carrier' shall not include any street, interurban, or suburban electric railway, unless such railway is operating as a part of a general steam-railroad system of transportation, *but shall not exclude any part of the general steam-railroad system of transportation now or hereafter operated by any other motive power.* * * * " 45 U.S.C.A. § 151.

The emphasized clause is not found in the section of the Bankruptcy Act under construction or in the various sections of the Interstate Commerce Act presently in force.

2. The statute as to abandonment of line, Interstate Commerce Act, § 1 (22) contains similar language. This question has never arisen as to the debtor.

Debtor's status under the Locomotive Inspection Act, 45 U.S.C.A. § 22, is still in controversy.

mission was not to be in this way diverted from matters of national significance to those primarily local.

The debtor is not so intertwined with the Pennsylvania that it cannot be reorganized as a local public utility. It has no significance to the Pennsylvania's trunk line business. Even as to the Pennsylvania's local commuter traffic it merely performs the same function which the buses and subways of the metropolitan area perform for railroads. Its contracts with the Pennsylvania do not change its basic function. They merely make insignificant adjustments for the mutual benefit of both roads to smooth off the relationship between a railroad bringing passengers into a metropolitan area and an interurban railroad which distributes those passengers to various points within the metropolitan area.

The motion to dismiss the Chapter X proceeding is denied. Application for approval of the petition under Section 77 is denied.