In the Matter of HUDSON & MANHATTAN RAILROAD COMPANY, Debtor.

United States District Court
S. D. New York.
Dec. 27, 1963.

See also, D.C., 178 F.Supp. 103.

Herman T. Stichman, New York City, Trustee of the Debtor.

Sullivan & Cromwell, New York City, for Hudson & Manhattan Corp.; David W. Peck, Theodore N. Tarlau, New York City, of counsel.

McGoldrick, Dannett, Horowitz & Golub, New York City, Gen. Counsel for the Trustee; William W. Golub, Myron S. Isaacs, Warren A. Weiss, New York City, of counsel.

Lamb, Langan & Blake, Jersey City, N. J., Sp. Counsel to the Trustee; Raymond J. Lamb, Charles W. W. Hutchinson, Jersey City, N. J., of counsel.

Milton, Keane & DeBona, Jersey City, N. J., Sp. Counsel to the Trustee; John J. Hanlon, Jr., Jersey City, N. J., of counsel.

Richard V. Bandler, and Richard L. Veron, New York City, for Securities and Exchange Commission.

Harold P. Seligson, and Morton E. Yohalem, New York City, for The Haas Committee.

Aranow, Brodsky, Bohlinger, Einhorn & Dann, New York City, for The Crockett Committee; Edward Ross Aranow, New York City, of counsel.

Cravath, Swaine & Moore, New York City, for the Trustee and Successor Trustee under the Adjustment Income Mortgage; William J. Schrenk, Jr., New York City, of counsel.

Louis Kipnis, New York City, for The Jones Committee.

Charles Poletti, Hoffman, Buchwald, Nadel & Hoffman, Buchman & Buchman, New York City, for Holders of Adjustment Income Mortgage Bonds; Charles Poletti, Bernard Buchwald, Abraham M. Buchman, New York City, of counsel.

Paul Benton, New York City, Committee for Holders of Adjustment Income Mortgage Bonds.

Milton M. Unger, Newark, N. J., for The Kohn Committee.

Daniel W. Blumenthal, New York City, for The Kohn Committee; Norman Dubin, New York City, of counsel.

Davis, Polk, Wardwell, Sunderland & Kiendl, New York City, for Morgan Guaranty Trust Co. of New York, Trus-O'Gorman FitzGibbon and Samuel F. Pryor, New York City, of counsel.

Lowenstein & Spicer, Newark, N. J., for Protective Committee for the Holders of First Mortgage Bonds; Alan V. Lowenstein, Newark, N. J., of counsel.

Arthur Miller, New York City, for Two Holders of First Mortgage Bonds.

Kelley, Drye, Newhall, Maginnes & Warren, New York City, for Manufacturers Hanover Trust Co., Trustee under the Refunding Mortgage; Frank H. Heiss, New York City, of counsel.

House, Grossman, Vorhaus & Hemley, and Edward M. Garlock, New York City, for the Petitioning Creditors, holders of Refunding Mortgage Bonds; Leonard Hemley, Edward M. Garlock, New York City, of counsel.

Strasser, Spiegelberg, Fried & Frank, New York City, for a holder, and for an Opposition Committee of Holders of Adjustment Income Mortgage Bonds; Leon Silverman, New York City, of counsel.

Moses & Singer, New York City, for a holder of Adjustment Income Mortgage Bonds, Refunding Mortgage Bonds, and Common Stock; Arnold A. Jaffe, New York City, of counsel.

Zane & Zane, New York City, for a holder of Adjustment Income Mortgage Bonds; Daniel M. Zane, New York City, of counsel.

Rosenman, Colin, Kaye, Petschek & Freund, New York City, for the Debtor from August 19, 1954 to November 22, 1954; Godfrey Goldmark, New York City, of counsel.

DAWSON, District Judge.

In this proceeding under Chapter X of the Bankruptcy Act, applications for compensation and allowances have been made pursuant to Sections 241–250 of the Bankruptcy Act, 11 U.S.C. §§ 641–650. During the course of the proceedings in reorganization various interim

allowances have been made which will be referred to hereafter.

The final fees and allowances now requested total $2,441,393.* The Securities and Exchange Commission (hereinafter referred to as the SEC), acting pursuant to Section 247 of the Act, 11 U.S.C. § 647, recommended $1,183,200. The reorganized company, the Hudson & Manhattan Company, retained former Judge David W. Peck as special counsel to appear on these applications. The special counsel analyzed the applications for fees and has made his own recommendations with reference thereto. His recommendations aggregate $810,150. As will hereinafter appear, the Court now awards the aggregate sum of $1,-162,700.*

The reorganization that has been accomplished was a difficult and successful one. The proceedings were instituted on August 11, 1954 by an involuntary petition filed in this court by three bondholders of the Debtor. The Court authorized the Debtor temporarily to continue the operation of its business. The Debtor moved to dismiss the involuntary petition on the ground that Section 77 of the Bankruptcy Act should govern the reorganization of the Debtor.

On November 24, 1954, the Court appointed William W. Golub as Receiver of the Debtor and thereafter ruled that Chapter X, and not Section 77, governed the reorganization of the Debtor (D.C., 126 F.Supp. 359). The Debtor then filed an answer and consent to reorganization in the Chapter X proceeding.

On December 14, 1954, the Court entered an order approving the involuntary petition under Chapter X and appointed Herman T. Stichman as Trustee of the Debtor.

The Debtor was a corporation organized and existing under the laws of New York and New Jersey. It was created in 1906 by the consolidation of three predecessor corporations. In 1954 it was engaged in two types of business activities: the ownership and operation of the Hudson Tubes, an interurban electric railroad; and the ownership and operation of two 22-story office buildings located at 30 and 50 Church Street, known as the Hudson Terminal Buildings, and a number of smaller loft buildings that provided light and air protection for the office buildings.

The Hudson Terminal Buildings were constructed in 1907 and 1908, and included five-story annexes erected in 1912. The buildings, at the time of the institution of the reorganization proceedings, were substantially as they had been when originally erected, except for renovation of ground floor lobbies in 1940 and 1941, and partial substitution of alternating current for direct current. They were almost fully rented, mostly at moderate rentals. During 1954 income from the real estate operations was about $3,280,000 and the net real estate operating income was about $1,120,000.

The Debtor's railroad system provided passenger service only, under the Hudson River, between stations in downtown and midtown Manhattan and stations in Jersey City and Hoboken, New Jersey. Pursuant to agreements with the Pennsylvania Railroad Company the Debtor also operated a joint rapid-transit system between Hudson Terminal in Manhattan and Newark, New Jersey. In 1954 the Debtor carried about 37,300,000 passengers; railroad operating revenues were about $7,170,000 and the net railroad operating loss for 1954 was about

---

* During the course of the reorganization proceedings, the following interim allowances have been made to various applicants pursuant to orders of the Court:

Herman T. Stichman—$245,000
McGoldrick, Dannett, Horowitz & Golub —$540,000
Lamb, Langan & Blake—$34,300
Roberts & McInnis—$1,250

Morgan Guaranty Trust Company of New York—$7,416.66 (as Trustee under the First Mortgage)
Manufacturers Hanover Trust Company —$6,600
Morgan Guaranty Trust Company of New York—$850.68 (as Trustee under Adjustment Income Mortgage)
Chemical Bank New York Trust Company—$11,875.

$316,000, after an accrual of $561,000 for depreciation.

The financial difficulties of the Debtor stemmed from a progressively increasing squeeze on the railroad operations from rising operating expenses and the coincident loss of passengers to publicly-financed vehicular crossings of the Hudson River by bridge and tunnels. For example, in 1927 the Tubes carried 113,-000,000 passengers. By 1954 the number of passengers had dropped to approximately 37,300,000. An important cause of this decline was the construction by the Port of New York Authority of tax-free publicly sponsored facilities for crossing the Hudson River (the Holland Tunnel, the Lincoln Tunnel and the George Washington Bridge). This made it possible for persons desiring to cross from New Jersey to New York, and vice versa, to travel by automobile or by bus and thereby drastically reduced the revenues of the Tubes. In the meantime, railroad operating costs, particularly labor costs, had increased tremendously. The Debtor's efforts to increase revenues by increasing fares had been largely frustrated by the competition of buses and private cars.

At the same time the Debtor was unable to provide sufficient funds to modernize its office buildings. By 1954 competition from new buildings constructed or about to be constructed in downtown Manhattan threatened to decrease sharply the Debtor's real estate revenues. No funds were available for urgently needed capital improvements.

The problem that faced the Trustee, his counsel and the Court in the reorganization proceedings was quite different from that which is faced in most Chapter X reorganizations. The problem which faced the Debtor in 1954 was not a problem which could be met by a mere recasting of its capital structure. It obviously was not a problem which could be met by increasing fares because each increase in fares led to a reduction in the amount of passenger travel.

The ultimate fate of the Debtor's railroad was particularly dependent upon the awakening of an understanding by the public and public officials as to the vital role of the railroad in the future of commuter transportation in New York. It soon became obvious that the railroad would never be a substantial earner as a purely private operation. It was therefore imperative that any reorganization plan be directed toward the possibility that the railroad would either be sold to or condemned by a public agency. The reorganization thus involved not only the usual activities of a trustee and his counsel for a reorganization plan, but also carefully designed steps on other fronts to stimulate public interest so as to make a reality of the potentiality of public assistance or takeover.

In the meantime it became necessary for the Trustee to supervise the actual operation of the railroad properties and the real estate and other numerous matters which came up during the reorganization and which required action.

In February 1955 the Debtor filed a petition for leave to employ engineers at the expense of the estate to appraise the Debtor's property as of August 11, 1954. In March 1955 the Debtor filed a petition for leave to withdraw its amended answer and consent and to file an answer *de novo* omitting the Debtor's consent to reorganization under Chapter X. In April 1955 the Court denied the petitions. Thereafter the Court of Appeals unanimously affirmed the orders denying the petitions. (2 Cir., 229 F.2d 616). Application for a writ of certiorari was denied by the Supreme Court. (351 U.S. 982, 76 S.Ct. 1049, 100 L.Ed. 1497. (1956)).

The Court found that at the time of filing of the involuntary petition in bankruptcy the Debtor was unable to meet its debts as they matured. (D.C., 138 F.Supp. 195).

In August 1957 the Trustee's plan of reorganization was filed, and between October 1957 and May 1958 hearings were held on the Trustee's plan and a comprehensive record was made. The plan was then submitted to the Interstate Commerce Commission, the New Jersey

Board of Public Utility Commissioners and the Public Service Commission of New York for suggested amendments of or objections to the plan. After a hearing on the statements filed by the regulatory commissions, the Court entered an order in June 1958 finding the Trustee's plan worthy of consideration and submitting it to the SEC for examination and an advisory report.

As a result of conferences held in 1958 among representatives of the three classes of bonds of the Debtor, substantial agreement was reached on the Trustee's plan, with minor modifications. On October 31, 1958, the Trustee filed Amendment No. 1 to the plan, revising it in essential conformity with that agreement. Two additional amendments were proposed on behalf of certain bondholders, making revisions in certain incidental provisions of the plan. In November 1958 the Court found the Trustee's amended plan and the proposed amendments thereto worthy of consideration, and submitted them to the SEC for examination and report in lieu of the plan previously submitted. In December 1958 the SEC filed its report on the Trustee's amended plan and the proposed amendments, concluding that the amended plan was feasible and fair and suggesting one revision which was made therein relating to the selection of the initial directors of the reorganized companies.

On April 28, 1959 the Court entered its opinion and findings of fact and conclusions of law, approving the Trustee's amended plan as fair and equitable and feasible, subject to the filing of an amendment revising the provision for selection of the initial directors (D.C., 174 F.Supp. 148). The plan was then modified with reference to the provision for the selection of initial directors. On May 1, 1959 the Court approved the Trustee's amended plan as so modified and in June, 1959 the plan was submitted to the creditors and bondholders of the Debtor for their acceptances. Several stockholders of the Debtor appealed from the approval order. In May 1960 the

order was unanimously affirmed by the Court of Appeals (2 Cir., 278 F.2d 402).

During the voting on the plan, certain holders of the junior bonds (the adjustment income mortgage bonds) organized a campaign against acceptance of the plan by their class. The plan was accepted by the holders of both classes of senior bonds and by unsecured creditors, but not by the junior bondholders. Thereafter various hearings were held and conferences arranged among the various groups of bondholders. A proposed Amendment No. 3 was filed by the Trustee as a result of these conferences. Hearings were held on the plan as so amended. The plan was then referred to the SEC which submitted a supplemental report concluding that the plan, as amended, was fair and equitable and feasible and should be approved.

In April 1960 the Court found the plan to be fair and equitable and feasible and entered an order approving it. The plan was accepted by all classes of creditors and security holders affected by it, and was confirmed by the Court in June 1960.

It then became necessary to secure the approval of various regulatory commissions of certain major transactions incident to the consummation of the plan. An application was first made to the Interstate Commerce Commission. In March 1961, Division 4 of that Commission issued a report and order dismissing all but one minor aspect of the Trustee's application on the ground of lack of jurisdiction. If the Interstate Commerce Commission lacked jurisdiction it became necessary to secure the approval of the Public Service Commission of New York and the New Jersey Board. The Public Service Commission approved the transactions. The New Jersey Board dismissed the Trustee's petition for approval without prejudice. The Trustee moved for and secured a rehearing, but no decision had been rendered prior to December 12, 1961, at which time the Trustee withdrew his petition before that Board.

Various labor organizations representing employees of the Debtor filed with the

Interstate Commerce Commission, late in March 1961, a petition for reconsideration of the report and order of Division 4. This petition for reconsideration was supported by the Trustee, who filed a memorandum in support of the ICC's jurisdiction. On December 1, 1961 the full Commission handed down a report and order reversing Division 4 on the jurisdictional issue, and approving the transactions covered by the Trustee's application. The plan was thus consummated as of midnight December 31, 1961.

The plan of reorganization was designed to resolve a number of problems of unusual perplexity and to meet the statutory standards of fairness and feasibility. It was considered essential to separate the railroad and real estate businesses of the Debtor into two corporations, and to create corporate and capital structures that would preserve the prior rights of the senior bondholders while protecting the rights of the junior bondholders. Special provisions were required to take into account the possibility of an advantageous sale of the railroad to a public agency.

The plan provided that the Debtor would be converted into a real estate company, and that a new railroad company would be organized as a subsidiary of the real estate company. The real estate company would retain all the assets of the Debtor, except the railroad properties, and would acquire all the common stock to be issued by the railroad company. Its principal assets would be the Hudson Terminal Buildings, including the land on which they are situated, and the stock of the railroad company. Cash and deposits would be retained by the real estate company.

The railroad company's assets would consist substantially of the railroad property of the Debtor, exclusive of any part of the Hudson Terminal Buildings and the land on which they are situated. They would include the materials and supplies and other assets incidental to the operation of the railroad and enough cash deposits and governmental securities to cover its liabilities, to provide working capital and to meet the estimated cash operating losses over a limited period. Its only outstanding securities would be its common stock, all to be acquired and held by the real estate company.

The real estate company's outstanding securities would consist of $10,038,000 principal amount of new bonds and common stock to be issued in two classes: A and B. The new bonds and 590,476 shares of Class A stock would be distributed pro rata to the public holders of the first mortgage bonds and refunding mortgage bonds of the Debtor. The Class B stock of 58,849 shares would recognize the interest of the junior bondholders in unmortgaged assets of the Debtor and their right to receive the proceeds of any sale of the railroad after satisfaction of the rights of the senior bondholders. The Class B stock was distributed pro rata to the adjustment income mortgage bondholders.

The general unsecured creditors were to be paid in cash at the rate of ten cents per dollar of claims allowed. No provision was made for the stockholders of the Debtor since its assets were insufficient to pay its creditors in full. Approximately 91% of the new common stock would be Class A stock, and approximately 9% would be Class B stock. Both classes would represent the same equity per share in assets and earnings of the real estate company and in the proceeds of any sale of the railroad company property up to $18,500,000. The Class B stock would also have the right initially to share in ninety per cent of the amount realized on the sale of the railroad company's assets in excess of $18,500,000, with the balance going to the Class A stock.

The securities issued and to be issued by the reorganized company have an aggregate current market value as of December 17, 1963 of $34,230,000. During the course of the reorganization, amounts aggregating $3,700,000 were distributed to the holders of the senior securities of the Debtor.

824

During the time these proceedings were pending the Trustee, assisted by his counsel, had waged an active public relations campaign to convince public officials of New York and New Jersey that a continuance of the commuter transportation service of the Tubes would require public support or takeover by a governmental organization. Initially the Port of New York Authority had been approached to see whether it was interested in taking over the ownership and operation of the Tubes. It refused to consider the proposition. Later it reported that it would not even discuss the matter as long as the Debtor was in reorganization proceedings. However, during the period of time that the reorganization was before the Court, public sentiment both in New York and New Jersey grew so strong for an assumption by the Port of New York Authority of its responsibility for commuter transportation that the legislatures of New York and New Jersey both passed legislation (as urged by the Trustee) providing for the takeover of the Tubes and the real property of the Debtor by the Port Authority.

On or about July 1, 1962 the Port Authority Trans-Hudson Corporation started condemnation proceedings and as a result of filing of an order granting possession on September 1, 1962, title to the Tubes and substantially all of the real property of the Debtor was acquired by the Port Authority. Proceedings are pending in the Supreme Court of the State of New York to determine the value of these properties in the condemnation proceedings. The Port Authority has indicated that it regards $20,500,000 as being a fair price for the properties. The reorganized company indicates that it believes the condemnation award will be very substantially higher. So far the reorganized companies have received $16,-000,000 as an advance payment which was paid to them pursuant to the provisions of New York law governing condemnation by the Port Authority. The Company has ample funds to pay the allowances which are here made by the Court.

The reorganized company has given notice that it intends to call the first mortgage bonds and pay for them out of the proceeds of the advance payment which it has received. This will leave the reorganized company with only the Class A and Class B stock outstanding. How much the holders of those classes of stock will receive will depend upon the final award in the condemnation proceeding.

Thus a situation which at the outset of the proceedings looked as though it would result in a liquidation of the property with little to be received by the creditors, has worked out advantageously. That the creditors expect to receive an excellent return on their investment is indicated by the current market value of the securities. The Company has been successfully reorganized; its assets are being taken over by a solvent public agency and the full value of those assets will be available to the creditors of the Debtor at a price to be determined in a judicial proceeding. Furthermore, the operation of the interstate rapid transit system has been continued to the advantage of the public and the commuters.

Needless to say, in the course of the reorganization proceedings, numerous groups and attorneys participated. They have filed their applications for allowances. A hearing has been held and briefs have been filed; the Court has examined the record and the briefs. In the course of the hearing the Court was immensely aided by the recommendations of the SEC, which were delivered in an oral report by Mr. Bandler. Representatives of the SEC interviewed the applicants, checked over their hourly statements and their disbursements records and made a constructive series of recommendations. The Special Counsel employed by the reorganized Company for the same purpose have also immensely assisted the Court in making its determination of allowances to be granted. They filed a special, printed report with their recommendations.

The Court has, in accordance with the policy laid down by the courts, given great weight to the recommendations of

the SEC as being an independent agency. The Court has allowed the Trustee and counsel for the Trustee slightly more than the amounts recommended by the SEC because it feels that the SEC did not fully evaluate the services rendered by them in stimulating a climate where a takeover by the Port Authority became possible and inevitable. In certain other cases the Court has allowed less than the amounts recommended by the SEC for the reasons set forth in the opinion. Overall total allowances are less than those recommended by the SEC.

The Court is well aware that numerous of the applicants will be disappointed in not receiving their sought-after allowances in full. The fact that the allowance was not granted in full is not a reflection upon either the persons making the application or the work which they did. It is inherent in the situation that we are here dealing with an insolvent estate and, as the courts have said, "economy of administration" is something which the Court must take into account in granting allowances. In granting allowances in a situation such as this it is impossible to make allowances commensurate with fees which would be received in ordinary matters. Just as some of the creditors of the Debtor had to take some loss, so the attorneys and committees participating in the proceeding cannot be expected to be paid what they would be paid by an ordinary client. The Court has, with full recognition of the necessity for an economy of administration attempted to make the awards on the value of the services rendered to the reorganization. See Surface Transit, Inc. v. Saxe, Bacon & O'Shea, 266 F.2d 862, 865 (2d Cir. 1959).

The applications for allowances and the determination of the Court thereon are as follows:

## THE TRUSTEE AND COUNSEL TO THE TRUSTEE

Herman T. Stichman

■ Mr. Stichman acted as Trustee of the Debtor from December 14, 1954 to December 31, 1961. He devoted his full time to the Debtor for a period of somewhat over seven years. He received interim compensation at the rate of $35,-000 a year. The Court has taken into account that the Trustee had no overhead expense and that his interim compensation was always assured.

In his capacity as Trustee Mr. Stichman performed three types of services:

(1) He was Chief Executive of the Debtor.

(2) He was the primary moving spirit in the development of the plan of reorganization; and

(3) Recognizing that the ultimate fate of the Debtor was largely a matter of inducing some public authority to take it over in condemnation or by sale, he devoted a considerable part of his activities to creating a climate of public opinion where this would be possible and in securing the necessary legislation authorizing the Port of New York Authority to take over the Debtor and in persuading the Port Authority and public officials that this was a desirable move.

Mr. Stichman's services as Chief Executive of the Debtor would have warranted compensation not less than the $35,000 he received. As a result of his assuming this position it was unnecessary for the Debtor to have a president or a number of vice-presidents or a confidential aid to the president, all of which had been on the payroll prior to the time Mr. Stichman assumed his duties. The former president of the Debtor drew a salary of $40,000 per annum. By serving as Chief Executive of the Debtor and performing duties previously carried out by a number of paid officials, Mr. Stichman aided in the economical administration of the property of the Debtor. His services, over and above those duties, in connection with the plan of reorganization and in creating a situation where a takeover of the Debtor by a public authority was made possible, are services for which he was not receiving interim compensation. The SEC in its report states, with reference to the latter matter: "It is equally

clear that during the course of the proceeding Mr. Stichman's activities did result in keeping the problem alive before the public, and did result in creating the kind of atmosphere and certainly aided in the creation of the kind of atmosphere in which the Port Authority could make the proposal it did." These services are outlined in detail in the application for fees. The Court, which had almost daily contact on the matter, appreciates the skill, ingenuity and persistence with which Mr. Stichman tackled this problem. They are services of a type which involved public relations, a knowledge of the factors which influence governmental authorities and legislative bodies and a skill in securing the proper results from those bodies. The Court is of the opinion that the SEC in appraising the value of Mr. Stichman's services looked at those services in the light of the ordinary services performed by a Trustee in maintaining a Debtor and in promulgating a plan of reorganization, and did not appreciate these other services which Mr. Stichman performed because they are not the type services customarily found in reorganizations. Mr. Stichman has requested a further allowance of $420,000. The counsel for the reorganized Company has recommended that an additional allowance be paid to him of $177,500. The SEC has recommended that an additional allowance be paid to him at this time of $140,000. The Court, after considering all the matters, makes an additional allowance to the Trustee at this time of $200,000. Unpaid disbursements are allowed in the sum of $78.11.

McGoldrick, Dannett, Horowitz & Golub—Counsel to the Trustee

█ This firm has acted as counsel for the Trustee since December 14, 1954. As the SEC stated in their report: "Trustee's counsel were involved not only in the reorganization aspects of the Debtor and its affairs, but actually they acted as general counsel for an operating company with two businesses—the real estate business of some magnitude involving two large buildings, and a railroad business running the Hudson Tubes between here and New Jersey."

The firm is a firm with considerable experience in reorganization matters. The SEC report said: "We believe that counsel did competently handle the affairs of this estate." It also said: "In the area of plan promulgation we feel that Trustee's counsel performed the major service * * * we feel that basically the structure of the plan and the working out of its provisions were largely the work of Trustee's counsel." The result of the activities of the Trustee and his counsel was well summarized by the report of the SEC when it stated: "As a result of the very effective preparation for plan hearings, we had in this proceeding probably as clear, as orderly, as expeditious and as complete a hearing on the plan as one could reasonably expect."

Counsel for the Trustee has been receiving annual interim allowances at the rate of $80,000 a year, except for the six months period ending November 30, 1961 when "as a result of the lessening of the amount of time necessarily devoted to this case during the past six months" counsel requested and received $20,000.

In all, the firm received interim allowances of $540,000 for the period from December 14, 1954 through November 30, 1961.

The firm has filed an elaborate petition for allowance, seeking an additional allowance at this time of $810,000. Counsel for the reorganized Company has recommended an additional allowance at this time of $340,000. The SEC has recommended an additional allowance at this time of $560,000.

The application for fees states that the number of hours spent on the matter totals 46,439, of which approximately 60% was partners' time. The Court, after considering all of the facts and the various reports and recommendations makes an allowance at this time of additional compensation of $600,000 to this firm. The Court also makes an allowance for unpaid out-of-pocket disbursements in the sum of $1,125.18.

## SPECIAL COUNSEL TO THE TRUSTEE

In the course of the reorganization proceedings it became necessary for the Trustee to engage special counsel in New Jersey and in Washington, D. C. Retention of these special counsel was made pursuant to applications to the Court and approval of the Court. They have now made application for final allowances. The special counsel are:

Lamb, Langan & Blake, of Jersey City, N. J.

■ This firm was retained pursuant to Order No. 14, dated January 6, 1955. In the order the firm was granted leave to request semi-annual interim allowances for services rendered, not to exceed for each semi-annual period the sum of $3,000. Pursuant to that authorization this firm filed thirteen interim applications for allowances and has received as aggregate interim payments so far the sum of $34,300.

While the firm expended time and effort in tax litigation and negotiations in connection with the Public Utility Commission, etc., for the most part its services related to the defense of accident claims brought against the Trustee. In their requests for interim allowances they itemized the time spent during the preceding six months' periods and the services rendered during those periods. In six out of the thirteen applications for interim allowances they requested less than the permissible amount of $3,000.

In their present application for fees they set forth that the firm spent 4,294 hours in connection with their activities in behalf of the Trustee. However, the partner who testified admitted that their records were not kept in the customary form and that the hours set forth represent a subsequent estimate of the time spent on the matter, based upon the entries in their office records as to what work had been done. Their estimate of time is broken down roughly as follows: 2,500 hours for senior partners, 1,200 hours for junior partners and 600 hours for associates. However, in the light of the circumstances under which these time records were prepared, it cannot be concluded by the Court that they accurately represent the actual time spent by this firm on the matters to which they refer, and the Court concludes that the time estimates are estimates of "probable" time spent, rather than an accurate statement of the actual time spent.

The SEC recommended that $75,000 be paid to this firm which, deducting the $34,300 already received, would require a payment at this time of $40,700. The Company recommends an aggregate payment to them of $45,000, which would mean an additional payment at this time of $10,700. They seek an aggregate payment of $107,350, or an additional payment at this time of $73,050.

The Court cannot understand why, if the firm was entitled to semi-annual payments of $3,000 for interim allowances, and if they now feel that the payments which they received were inadequate, they failed to ask for full interim allowances at the times when they could have asked for them.

The Court fixes the final allowance to this firm in the sum of $50,000, of which they have already received $34,300 on account, making a total amount payable to them at this time of $15,700.

An allowance of $321.68 is also made for unpaid disbursements.

Milton, Keane & De Bona, of Jersey City, N. J.

■■ The predecessor of this firm, Milton, McNulty & Augelli, was retained by the Court to act as special counsel for the Trustee in New Jersey, pursuant to Order No. 285 dated December 5, 1958. Unlike Lamb, Langan & Blake, they were engaged on a schedule of charges for particular services and from time to time put in bills for those services, which have been paid. What they seek in this application is additional compensation for other matters in which they acted as special counsel, particularly with reference to activities before the New Jersey Board of Public Utility Commis-

sioners and the New Jersey state courts with respect to fare increases and with respect to steps taken in connection with consummation of the plan of reorganization in so far as approval had to be obtained in New Jersey, and matters of that nature. The services which they rendered are described in the petition. They state they spent 202 hours in these services, almost half of which was associates' time. They seek an allowance at the rate of $30.00 an hour, or the sum of $6,000. The partner of the firm who testified in the proceedings stated that such charge would be a customary one to clients of the firm. However, such test is not one which is applicable in determining allowances in Chapter X reorganizations. See Finn v. Childs Co., 181 F.2d 431, at p. 436 (2d Cir. 1950).

The SEC's report on this application is as follows: "While we believe that the request is on the high side, it is a small request, and we have no objection to it." Special Counsel for the Company recommended an allowance of $4,000 as "appropriate." The Court does not believe that applications for high allowances should be approved merely because they constitute a "small request." Considering the time spent and the services rendered, the Court approves a fee for these special services of $4,000.

This firm sought reimbursement for disbursements of $160.70. The SEC objected to the inclusion therein of a lunch club bill. No proof was offered thereon by the applicant. The Court therefore disallows so much of the disbursements as include this lunch club bill and approves payment of the balance of disbursements in the sum of $138.66.

Roberts & McInnis, of Washington, D. C.

■ This Washington firm was retained as special counsel for the Trustee in connection with matters pending before the ICC and other regulatory matters. The Trustee was authorized to retain this firm on February 23, 1955. The firm seeks a final allowance of $6,755, of which $4,255 is for professional services rendered prior to February 22, 1955 and $2,500 is for services since February 23,

1955. Of the latter amount of $2,500, $1,250 has already been received pursuant to Order No. 53 for services since February 23, 1955.

The SEC reports: "In any event, we believe that the services which were performed prior to February 23rd probably had an effect upon the services thereafter, and looking at those alone, and eliminating a good deal of the services which did not seem to have any continuing nature, we believe that an allowance of $4,000 would be appropriate, of which $1,250 has already been paid." Counsel for the Company recommended payment of $1,250, thereby eliminating any payment for services prior to February 23, 1955, even though such services had an effect on the services rendered thereafter.

This firm had special expertise in matters before regulatory commissions in Washington and its services were necessary for the Trustee. In the light of the foregoing, the Court awards a final allowance to this firm of $3,000, of which $1,250 has been paid, leaving a payment to be made at this time of $1,750. In addition allowance is made of $408.28 for disbursements.

## FIRST MORTGAGE BOND REPRESENTATIVES

The Debtor had outstanding in the hands of the public $942,000 face amount of first mortgage bonds. Four representatives of this class, the mortgage Trustee, its counsel, counsel for a committee and counsel for two individual holders of first mortgage bonds, have submitted applications for fees totaling $140,775, or approximately 15% of the face amount of the bonds publicly held. These various applications will now be considered.

## Morgan Guaranty Trust Company of New York—Indenture Trustee

■ As has been stated, the only amount of first mortgage bonds outstanding in the hands of the public was $942,000. However, $66,000,000 of these bonds had been pledged with the Hanover Bank as collateral for the refunding mortgage. This trustee seeks an al-

lowance of $4,458.34 for ordinary administrative services, and $24,400 for special and extraordinary services.

Pursuant to Order No. 202, the Morgan Guaranty Trust Company has been receiving $1,000 annually for its ordinary administrative services. However, apparently it believes it should receive as much as it did prior to the bankruptcy proceedings, which was $1,500, and therefore makes this additional request. The SEC report, with reference to this application for ordinary services, is as follows: "The Commission's view is that the amounts already received by the bank for regular services are amply compensated (sic) for those activities, and we feel particularly enforced in this view in light of the fact that Manufacturers Hanover, which was paid at a similar rate, has not deemed fit to come in and ask for anything further."

It appears that the bank has received in the aggregate $7,416.66 for regular services. It appears further that there was a brief period of time for which it did not receive compensation. The SEC has recommended an additional payment of $500 for this brief period of time. The Court awards as an additional allowance to Morgan Guaranty Trust Company, for its ordinary services, the sum of $500.

The Indenture Trustee also seeks compensation of $24,400 for special and extraordinary services rendered in the course of reorganization. The Court agrees with the comment of the SEC on these services: "We also feel that in great measure the activities of the bank in so far as so-called extraordinary services were concerned, were principally those of its counsel. The bank remained informed, consulted with counsel, and generally moved in that direction through its counsel."

The SEC has recommended that $6,000 would be "an appropriate measure and represent reasonable compensation." Special Counsel for the Company urged that allowances for extraordinary services should not exceed $7,500.

The record and testimony of the trust officer who testified on behalf of this applicant would indicate that a great deal of the work which was done by it was ordinary routine activity. For example, every paper in the proceeding apparently was read by at least two and usually three men in the organization. This would include such things as consideration of a proposed settlement of a tort action. Compensation allowable to an indenture trustee can only be for services beneficial to the administration of the estate. In re Porto Rican American Tobacco Co., 117 F.2d 599, 601 (2d Cir. 1941). That the services of this Trustee were beneficial to the estate is without doubt, but the extent to which it is entitled to compensation therefor in the sum requested by it may be more doubtful. The Court awards to Morgan Guaranty Trust Company for its extraordinary services the sum of $6,000.

Davis, Polk, Wardwell, Sunderland & Kiendl

■ This firm acted as counsel for Morgan Guaranty Trust Company throughout the proceeding. It seeks an allowance of $45,000 for these services. Counsel for the Indenture Trustee was active, along with other representatives of the senior bondholders, in urging the rights of the senior bondholders. The application sets forth that 1,452 hours were spent on the matter, of which partners spent 537 hours and the balance was spent by associates. Some of this time undoubtedly involved an overlapping and duplication. It is, of course, true that the Indenture Trustee and its counsel were not volunteers in the proceeding. It was necessary that they keep informed of proceedings and participate therein. For such services they are entitled to be compensated.

The SEC recommends a fee of $27,500; counsel for the Company recommends a fee of $25,000. Having in mind the nature of the work done, the time spent and such contributions as were made by counsel in the course of the reorganization proceedings, the Court accepts the

recommendation of the SEC and allows $27,500 to this firm.

This firm requested reimbursement for $144.17. However, certain of the disbursements included amounts for matters of a local nature, such as telephone calls. The SEC has recommended that $96.09 be allowed for disbursements. The Court accepts this recommendation and allows that sum.

Alan V. Lowenstein

■ Mr. Lowenstein, a member of the firm of Lowenstein & Spicer, acted as counsel for a committee representing the holders of the first mortgage bonds. The committee appeared early in the proceedings and the major effort of the committee and of Mr. Lowenstein in particular was the filing of a petition to declare invalid the pledge of the first mortgage bonds with the Manufacturers Hanover Bank and in effect to assert that the pledged bonds in the hands of the bank would be subordinate to the $942,000 of first mortgage bonds outstanding in the hands of the public. This issue was finally compromised by agreeing that the first mortgage bonds publicly held would have equal status with the refunding mortgage bonds. The controversy precipitated by this petition was inherent in the situation. The compromise which resulted in the plan was effected by the petition that the committee filed and which it strenuously urged. Mr. Lowenstein claims that he and his associates devoted some 630 hours to the proceeding, most of which were spent by persons considered to be partners of the firm. However, it would appear that most of the work could have been handled by persons other than those in partner category. Nevertheless, his services contributed to the ultimate determination of the rights of the parties in the litigation and thereby contributed to the ultimate plan of reorganization.

The SEC feels that reasonable compensation for these services would be $10,000; the Company feels that an appropriate fee would be $12,000. The Court accepts the recommendation of the SEC and awards to Mr. Lowenstein the sum of $10,000. It also awards $210.20 for disbursements.

Arthur Miller

■ ■ Mr. Miller appeared in the proceedings as counsel for his wife and mother-in-law who together held $7,000 face amount of first mortgage bonds. He seeks a fee of $36,000 which it appears would be at a much higher hourly rate than he receives from private clients and is five times the face value of the bonds represented by him. Mr. Miller supported the position taken by Mr. Lowenstein and the bondholders' committee. He appeared at a number of proceedings and participated in a number of conferences which resulted in the compromise as finally worked out in the plan of reorganization. The Court agrees with the conclusion of the SEC that "it is difficult to find particular contributions that Mr. Miller may have made to the proceeding." Undoubtedly he spent a great deal of time attending hearings and conferences and was vigorous in his espousal of the rights of his clients and of the first mortgage bondholders in general.

The SEC has recommended that he be allowed $7,500 as fair and reasonable compensation for his services. The Company urged that he should look to his personal clients for compensation and should receive no allowance from the Court.

The services that Mr. Miller rendered were primarily rendered on behalf of his individual clients, who were his relatives. While, of course, any security holder had a right to be represented in the proceedings, it does not follow that every security holder would have the right to have the fees of his own counsel charged as an expense of the reorganization. If every security holder of the Hudson & Manhattan Railroad Company had hired counsel to appear in the proceedings and if all of them had sought individual fees for appearing in the proceedings, attending hearings and conferences, etc.,

there would be very little left for the reorganized company. Where individual security holders, or their counsel, appeared in the proceedings, they are entitled to compensation only to the extent that they contributed something of value to the plan or to the administration of the estate. In re Porto Rican American Tobacco Co., 117 F.2d 599, 601 (2d Cir. 1941). See also Glasser v. Doyle, 223 F.2d 811, at p. 813 (2d Cir. 1955).

Since the SEC found it difficult to find any particular contributions that Mr. Miller may have made in the proceedings, and since the Court finds it impossible to discover any particular contribution made to the proceedings by him, the Court sees no basis for allowing him compensation out of the estate. He should look to his personal clients for compensation. The Court therefore declines to award Mr. Miller any allowance payable out of the estate.

## REFUNDING MORTGAGE BOND REPRESENTATIVES

Eight separate applications have been filed by the representatives of the refunding mortgage bonds, the total issue of which was $25,009,675. Applications were filed by the Indenture Trustee and its counsel, counsel for three individual bondholders who were petitioning creditors, two committees and their counsel, and the real estate consultant to one of the committees. The total amount sought for fees by these various representatives is $616,500.

Although Chapter X permits participation by a number of representatives of the same class, allowances may not be made for services which are a duplication of other services. The estate is to be charged "only one fee for a particular service, regardless of the number of attorneys involved in performing that service." Finn v. Childs Co., 181 F.2d 431, at p. 436 (2d Cir. 1950). It is on this basis that the Court has fixed the allowances for representatives of this class of security holders. The repre-

sentatives who have sought these fees are:

Manufacturers Hanover Trust Company

This bank participated in the proceedings as Trustee of the refunding mortgage bond issue. It played a rather active role because it felt that none of the committees representing this issue represented a large enough block of the issue to speak with authority on behalf of the issue as a whole. The SEC properly said: "This indenture trustee, we believe, was vigorous and active throughout the proceeding, through its own efforts, through the efforts of its counsel, in protecting the senior position."

The bank requested an allowance of $25,000. No time sheets were kept, nor was any considered time estimate made. A representative of the bank estimated that they had spent in the neighborhood of 1300 to 1500 hours on the matter, but in view of the fact that no records were kept of the time spent his estimate is not worth a great deal.

Both the SEC and counsel for the Company recognize the services which the bank rendered in the reorganization, as does the Court. Both the SEC and Special Counsel for the Company recommended that the fee allowed to the bank for these services should be $15,000. The Court agrees that this is a proper amount and fixes compensation to the bank, as Trustee of the refunding mortgage bond issue, at $15,000. It also allows disbursements in the sum of $1,329.

Kelley, Drye, Newhall, Maginnes & Warren

This firm acted as counsel for Manufacturers Hanover Trust Company, as Trustee. It requests an allowance of $86,000, which sum is arrived at by applying the firm's normal charges to the time devoted to this matter by Mr. Heiss and his associates. The firm spent a total of 2,569½ hours, of which a little less than half was partners' time. It requests compensation at the rate of approximately $33.00 an hour. Mr. Heiss,

a member of the firm, participated vigorously in the proceedings relative to the reorganization. His advice and counsel were availed of by the Court. The Court agrees with the comment of the SEC when it said: "We believe that the firm acted competently and actively in discharging its duties as counsel to the trustee." It is also true, as the SEC pointed out, that "there was a certain amount of duplication, perhaps necessary duplication, in the firm and with the activities of other representatives of the first mortgage bond."

The SEC recommended $65,000 be paid in compensation to this firm. The Company counsel recommended an allowance of $50,000. The Court believes that the SEC, which had ample opportunity to appraise the work of this firm, arrives at a figure which is more consonant with the compensation to be allowed in the matter. The Court therefore allows the sum of $65,000 to this firm for its services as counsel to the Indenture Trustee.

House, Grossman, Vorhaus & Hemley, and Edward M. Garlock

 The firm of House, Grossman, Vorhaus & Hemley, and Mr. Garlock, have filed an application for $250,000 "for a joint allowance * * * as attorneys for the Petitioning Creditors" and for services in connection with the filing of the petition for reorganization.

The record shows that a Mr. Schnur, an attorney whose father owned refunding mortgage bonds, consulted this law firm as to the feasibility of filing a petition for the reorganization of the Debtor, and they in turn communicated with Mr. Garlock. He took on an assignment to do this work. He made his headquarters in the firm's office, and they supplied the necessary facilities. Mr. Hemley, a member of the firm, attempted to assist Mr. Garlock. They jointly represented three refunding mortgage bondholders whose holdings totaled $46,000 face amount. These three bondholders were the petitioning creditors in the filing of an involuntary petition in bankruptcy. The petition and its finding was a significant achievement in the case. Afterward there was a great deal of effort expended in sustaining the petition, first against the efforts of the Debtor to withdraw its answer to the petition and then in extensive hearings which took place in connection with the answer of the stockholders. Mr. Garlock had the laboring oar in presenting evidence in support of the petition and Judge Walsh ruled that he had sustained the allegation that the Debtor was unable to meet its debts as they matured and again affirmed the initial approval of the petition.

Once the petition had been approved, Mr. Garlock's status as attorney for the petitioning creditors terminated for their role had been performed. Any subsequent participation in the proceedings by Mr. Garlock was only as counsel for the three relatively small holders of refunding mortgage bonds whose interests were also represented by the Indenture Trustee and two committees.

Mr. Garlock apparently has an erroneous impression as to the importance of his status in this proceeding based upon the fact that he had presented the original petition. The Court feels that a differentiation must be made between the services rendered by Mr. Garlock and the firm in filing and sustaining the original petition and the services rendered thereafter on behalf of the three refunding mortgage bondholders. The services rendered after the petition had been sustained were not of substantial importance; nor was Mr. Garlock, apparently, prepared in those appearances which he made in court. Judge Walsh, in one of the hearings, referred to "Mr. Garlock's chronic and consistent lack of preparedness." (Volume 3, p. 1313). Neither Mr. Garlock nor Mr. Hemley kept contemporaneous time records. Mr. Garlock estimated that he spent not less than 4,000 hours in the matter, and Mr. Hemley estimated that he spent six hours for every ten that Mr. Garlock spent. These estimates are not worth very much in the absence of contemporaneous records. The Court agrees with the report of counsel for the Company that "the

time estimate is obviously grossly exaggerated." Thus, Mr. Garlock testified that he put in 2500 hours a year in chargeable time and that he never had a holiday and never went away for a week end. His estimate of the time he spent is more a matter of his imagination than it is a statement of fact which can be taken into account by the Court. This does not detract from the services which he rendered in sustaining the petition for involuntary bankruptcy. However the other services he rendered thereafter were services which to a substantial extent duplicated the services of the Trustee of the refunding mortgage bond issue and the other committees representing that issue. None of these services resulted in any substantial value to the estate.

It was testified that there was an agreement between the firm and Mr. Garlock to divide the fee, and also an agreement with Mr. Schnur, an associate of the firm, who was to receive 8% of the fee. Mr. Schnur claimed that he spent 50 hours on the matter. The division of the fee between Mr. Garlock and the firm, and between the firm and Mr. Schnur, is not a matter for determination by this Court. The allowance of a joint fee is a matter for determination by the Court.

The SEC recommended a joint fee of $100,000; Company counsel concluded that "Mr. Garlock and his associates would be well compensated for their contribution in this proceeding by an allowance of $25,000." The Court allows to Mr. Garlock and the firm a joint fee of $50,000. The arrangements between themselves and with Mr. Schnur for the division of the fee is something which they must handle.

Disbursements are requested in the amount of $3,186.03. The disbursements were checked by the SEC which eliminated two items. The SEC recommended payment of disbursements in the sum of $2,378.76. The Court agrees with this recommendation and directs that this amount of disbursements be paid.

Certain notices of lien against any amount owing to Mr. Garlock have been filed by alleged creditors of Mr. Garlock and these liens must be satisfied if payment is made to him.

The Haas Committee

 This committee and its counsel entered the proceeding on March 7, 1956, as representatives of the Refunding Mortgage bonds. That class was already represented by a committee and by the Trustee of the issue, but the committee took the view that the refunding bonds "required more active and vigorous representation" and therefore entered into this proceeding.

The inevitable consequence was that counsel for two different committees on behalf of the same class attended the same court hearings, read the same court papers and participated in the same conferences, so that there are now two sets of applications for allowances by different committees and different counsel for the same class. This is in addition to the claim of the Indenture Trustee which took an active part in the proceeding because neither committee represented a large enough block of bonds to speak with authority on behalf of the issue as a whole.

This is a situation where the Court of Appeals has stated, in Finn v. Childs Co., supra, that while under Chapter X the fact that one committee is already at work will not preclude the subsequent intervention of another, the estate will not be called upon to pay twice or more for the same services.

The committee originally consisted of Ralph H. Haas, the late George J. Wise and the late Lloyd E. Dewey, and appeared in court by its counsel, Mr. Harold P. Seligson and Mr. Morton E. Yohalem. There is an over-all estimate of 500 hours spent by members of the committee, but no accurate and precise time records were kept. It does not appear that there were any full meetings of the committee but rather consultations either between members of the committee or through counsel.

The participation of this committee in the proceeding, except for the services of its counsel, did nothing constructive. Its counsel did render certain services for which a separate application is made. The committee asks an allowance of $10,000. The SEC recommended an allowance of $3,000; Company counsel recommended an allowance of $1,500. The Court makes an allowance of $2,000 to the members of this committee. The division among the members of the committee is a matter for them to undertake.

Disbursements are allowed in the sum of $827.32.

#### Harold P. Seligson and Morton E. Yohalem

 Mr. Seligson and Mr. Yohalem acted as co-counsel for the Haas Committee and request compensation for services rendered to the committee from March 1956 to the conclusion of the proceedings in 1961. They request an allowance of $115,000. Mr. Yohalem testified that basically this amount is reached by applying a $50 an hour rate to the estimated time devoted to the matter. They estimated that the time spent on the matter was 2,300 hours. However, Mr. Seligson's estimate is a total of 703 hours. Mr. Yohalem's time records had been lost when his secretary died and after her death he did not keep time records in this matter although he kept time records in other matters. In a Chapter X proceeding compensation is not to be paid to counsel for a committee on the basis of rates charged private clients, and particularly is this true when applicants are counsel for a second committee. The most important criterion is the extent to which the estate benefited as a result of applicants' services. Mr. Yohalem's claim at the hearing, as it was in the petition, was that the plan of reorganization ultimately adopted resulted solely from the ideas and proposals submitted by counsel for the Haas Committee. This idea cannot be taken seriously. The plan of reorganization was primarily due to the work of the Trustee. The SEC pointed out that the claim of Mr.

Yohalem that the Trustee's plan is traceable to suggestions of the Haas Committee "is somewhat extravagant" though it indicates that the proposals of the Haas Committee did have the germ of certain ideas that might have influenced the development of the plan. In the light of these considerations the SEC recommended compensation in the sum of $50,000 to these counsel; the Company recommended an allowance of $30,000. The Court makes an allowance of $40,000.

The SEC which checked the disbursements claimed, recommended that reimbursement be made for disbursements in the sum of $216.00. The Court accepts the recommendation of the SEC and allows disbursements in the sum of $216.00.

#### The Crockett Committee

 The Crockett Committee was the first committee for the refunding mortgage bonds. In December 1954, Keystone Custodian Funds, the holder of $2,347,000 of refunding bonds, had authorized the committee to act for it. The committee consisted of Mr. Crockett, the personal representative of Keystone, a Mr. Knight who was in the security business and Mr. Milner, who is in the real estate business. At one point the committee represented $3,024,000 of refunding bonds. Keystone, however, decided to liquidate its investment and before the end of August 1956 it disposed of holdings of $2,347,000 of refunding bonds. The committee and its counsel continued to participate in the proceeding with drastically reduced representation. When the Court, on December 8, 1959, called upon the participants to set forth the amount of their current representation, the committee listed holders of $194,000 of refunding bonds.

The committee requests an allowance to its members of $12,500. Mr. Crockett attended conferences and submitted affidavits while Keystone was still a bondholder. However it must be pointed out that he was being paid by Keystone to protect its investment in these bonds. Mr. Milner was in the real estate busi-

ness and he consulted with counsel for the committee respecting leases the Trustee proposed to enter into, the value of the buildings, etc. He, however, does not seek compensation in his capacity as a member of the committee but has submitted a separate application as "real estate consultant" to the committee. His services are compensable as a member of the committee. There is no reason for giving him an allowance as a member of the committee and also as a real estate consultant. The SEC after reviewing all of the services of this committee said: "We do not believe that the contribution of the committee was very significant, apart from that which may have been the contribution of its counsel, nor do we see that there was any special service that was performed." The SEC recommended that the committee be awarded $3,000. Counsel for the Company also recommended that compensation for all the members of the committee should not exceed $3,000. The Court agrees with these recommendations and fixes an allowance to the members of the committee of $3,000, to be divided among them in such manner as they deem appropriate.

Joseph Milner

 Mr. Milner submitted a separate application for an allowance in his capacity as real estate consultant to the Crockett Committee. He seeks an allowance of $25,000. At the request of the committee he made an appraisal of the building and at counsel's request testified about the appraisal at the hearing on the application to sell the building. In major part the $25,000 is sought for the appraisal and the testimony. It should be pointed out that the appraisal was not made at the request of the Trustee nor pursuant to any order of the Court. When the Trustee required the services of a real estate expert the Trustee secured an appraisal by a leading real estate man at a cost to the estate of $7,000.

If Mr. Milner is to be paid by the estate for the appraisal and the testimony he gave, it can only be on a showing that his volunteer services were of benefit to the estate. The SEC recommended an allowance to Mr. Milner of $3,500; the Company's counsel stated that "while Mr. Milner is entitled to compensation as a committee member, his request for a separate allowance for expert services should be denied."

The Court does not find that the appraisal submitted by Milner was of benefit to the estate. A further appraisal had to be secured by the Trustee from an independent real estate man. See also the opinion of Judge Walsh on Mr. Milner's appraisal, reported at pages 4032–33 of the transcript.

Where a committee member without request by the Court or Trustee voluntarily undertakes to make an appraisal of property he cannot expect to be compensated therefor except to the extent that his services benefited the estate. The Court can find no evidence that Mr. Milner's appraisal benefited the estate. The Court therefore declines to allow any compensation to Mr. Milner for services as a real estate consultant to the Crockett Committee. His services as a member of that committee have already been described and allowance made therefor. He is allowed disbursements of $622.83.

Aranow, Brodsky, Bohlinger, Einhorn & Dann

 This firm acted as counsel for the Crockett Committee and appeared in the proceedings in 1955. As has heretofore been pointed out, the initial reason for the activity of the Crockett Committee was its representation of the holdings of Keystone Custodian Funds. When most of these securities were sold out, that reason, and the importance of the committee, disappeared very promptly. However, counsel for the committee did perform certain services in connection with the matter. Mr. Aranow rendered beneficial services in connection with an insurance fund issue involving a claim that approximately $695,000 belonged to the holders of the Adjustment Income bonds.

The principal activity of this firm, however, was in examining, analyzing, sometimes approving and frequently opposing the Trustee's petitions for authority to enter into leases. Mr. Aranow's affidavit notes that there were from seventy-five to one hundred such applications and that he attended at least twenty-one hearings involving such applications. The SEC comments that these counsel participated more than other representatives of the refunding mortgage bonds in matters which affected the Debtor's real estate, "and sometimes in a sense may have over-participated." It does not appear, however, that the participation in these matters resulted in beneficial services to the estate. These counsel also opposed early programs sponsored by the Trustee for the modernization of the buildings. They participated in connection with the proceedings for promulgation of the plan. The SEC points out that "it cannot be said that any particular or unique contribution was made to the plan" by them.

Counsel, however, prepared certain tax memoranda dealing with various aspects of the plan which were of assistance in connection with resolving some problems in the matter.

The records show that there was an expenditure of 2,000 hours of time, two-thirds of which was attributed to partners, and most of that being time of Mr. Aranow. The firm seeks an allowance of $93,000. This figure was reached by taking partners' time at $50.00 an hour and associates' time at $20.00 an hour. This would be an inappropriate standard for compensable services in a Chapter X proceeding. Furthermore the Court must determine not the amount of time spent but rather the benefit accruing to the estate by the time spent. The SEC recommends an allowance to this firm of $50,000. Company counsel recommends an allowance of $20,000. The Court believes that the SEC has properly analyzed the contribution made by this firm to the reorganization and awards it the sum of $50,000. The SEC

checked the claim for disbursements, eliminating some items, and recommended reimbursement for disbursements in the amount of $581.02. This recommendation is accepted by the Court and this amount is allowed for reimbursement of disbursements.

## ADJUSTMENT INCOME MORTGAGE BOND REPRESENTATIVES

■ The adjustment income mortgage bonds were junior bonds. Twelve separate applications, totaling almost $375,000, have been filed by representatives of these bonds. Again, as with the refunding mortgage bonds, there were two committees and their counsel, and an Indenture Trustee and its counsel, who are claiming fees. When so many counsel appear on behalf of the same class at court hearings and claim compensation for reviewing the same court papers, the estate is not obligated to pay each of them for this inevitable duplication of services. Finn v. Childs Co., supra. It will be necessary to consider each of these applications separately to see what each applicant contributed to this reorganization.

### Morgan Guaranty Trust Company

■ Morgan Guaranty Trust Company, as well as being trustee under the first mortgage, was a trustee under the adjustment income mortgage. Due to a conflict in interest in representing these two classes of bondholders, it resigned in June 1955 as trustee under the adjustment income mortgage and was succeeded by Chemical Bank New York Trust Company. Morgan Guaranty Trust Company served as trustee for the adjustment income bonds from the beginning of the reorganization to June 9, 1955. By order No. 202 of this Court it received on account of the ordinary administrative services which it rendered in this period the sum of $850.-68. It now seeks a further allowance for these services in the sum of $2,530.03. The SEC recommends that for these services it receive the additional sum of $500. Nothing unusual was done by the bank during the period for which it

is claiming this compensation. It is seeking it merely for ordinary administrative services. A total of $1,350.68 would seem to be adequate for these services in that short period of time. The Court therefore allows to Morgan Guaranty Trust Company the additional payment at this time of $500.

Chemical Bank New York Trust Company

 This bank was appointed successor trustee of this bond issue on April 21, 1955. It has been paid for its normal administrative services. It now requests an allowance of $15,000 for non-routine services. There is annexed to the petition a schedule of the work done for which compensation is sought. It includes certain items for which, obviously, no compensation is payable, such as, for example, time spent in connection with the substitution of the bank as successor trustee and in connection with resignation of the firm of Cravath, Swaine & Moore as counsel for the bank because of a possible conflict of interest, and in connection with the possibility that the bank might act for the reorganized company.

The bank did not keep any time records and estimated some 500 hours spent in connection with this matter. The SEC reported that it had examined the bank's file and "we do not find, at least from the files, that there is evidence of any special study or any contribution to major matters in the proceeding. Here also we feel that the major service in this area was by counsel for the bank. At most, the services consisted of consultation with counsel and generally keeping abreast of the proceeding."

The SEC recommended an allowance of $3,000 for these services. Counsel for the Company recommended an allowance of $6,000. The Court accepts the recommendation of the SEC and allows the bank $3,000 for its non-routine services.

Cravath, Swaine & Moore

 This law firm acted as counsel for Chemical Bank New York Trust Company from April 21, 1955 until February 7, 1957 when it resigned due to a possible conflict of interest and the firm of Proskauer, Rose, Goetz & Mendelsohn was substituted as counsel. The SEC, after examining into this matter, reports that "we do not feel, also, that there was any substantial service that was rendered during this period. We have to bear in mind that this is prior to the stage in the proceedings when the plan was being actively promulgated and when the activities were stepped up. For the most part counsel followed the proceeding, reviewing matters which arose, attending hearings and, in a sense, doing the routine things counsel for an Indenture Trustee would normally do."

The time records of the firm indicate that approximately 555 hours of time were devoted to the matter, of which approximately 100 hours were partners' time. Of this a certain amount of time was devoted to discussions and conferences in connection with the resignation of the firm.

The SEC recommended compensation in the sum of $7,500; the firm requested an allowance of $12,500. Counsel for the Company recommended an allowance of $10,000. The Court believes that the allowance recommended by the SEC is proper and allows for the services of this firm the sum of $7,500.

Proskauer, Rose, Goetz & Mendelsohn

 This firm acted as counsel for Chemical Bank New York Trust Company in matters relating to the proceeding commencing with February 8, 1957, succeeding the firm of Cravath, Swaine & Moore in the matter. With respect to the plan counsel did assume a fairly active role on behalf of the adjustment income mortgage bonds. It did much to bring the groups of these bondholders together in order to present as much of a united front as possible. As the SEC said, the firm, together with counsel for Manufacturers Trust Company was "instrumental in keeping the conferences going and keeping the parties together and talking when it appeared that the

838

matter would require litigation to the bitter end. In all, we feel from the time they came in in 1957 they took a leading role on behalf of the Adjustment Income Mortgage bondholders that they represented."

The firm states that there was a total of 1,445 hours spent on the matter, of which 587 hours represented partners' time, and seeks an allowance of $50,000.

The SEC recommended that compensation for services rendered should be the sum of $27,500; counsel for the Company urged that the allowance should not exceed $25,000. The Court accepts the recommendation of the SEC and awards compensation in the sum of $27,-500. It also allows out-of-pocket disbursements in the sum of $820.50.

The Kohn Committee

■ This committee appeared in the proceedings for the adjustment income bonds. Its highest representation was $1,115,300 face amount of bonds. By December 1959 the total amount it represented was only $400,000. The committee consisted of Richard E. Kohn, who is in the securities business, H. Arthur Mousley, vice-president of a bank, and Paul Benton, an engineer who acted as secretary of the committee. No time records were kept by the committee. Most of the activity of the committee was that of Mr. Benton. He was a consulting engineer who also acted as consultant for the Twenty-Third Street Association. In that connection he had an interest in promoting the continuation of the operation of the Hudson Tubes along Sixth Avenue. It is difficult to see how his services in connection with the Kohn Committee differed from his services to the Association. They seem to be quite parallel.

While the committee did confer with counsel and support the activities of counsel in behalf of the committee, they have failed to point out where their services were of benefit to the estate. The committee seeks an allowance of $17,500. The SEC recommends an award to the

committee of $2,000. Counsel for the Company also urges that the award to the committee should not exceed $2,000. An award of $2,000 is made to this committee.

Milton M. Unger, Daniel W. Blumenthal and Estate of Edward Endelman

■ These three people have filed a joint application for $90,000 as counsel for the Kohn Committee. Of these three the only one who rendered any services beneficial to the estate was Mr. Endelman. It appears that Mr. Unger's role was that of supplying the bondholder, his son. He consulted Mr. Endelman, an attorney who specialized in reorganization matters, and Mr. Endelman brought in Mr. Blumenthal. Mr. Endelman familiarized himself with the proceeding and participated to an extent on the jurisdictional questions that arose and in opposing the Debtor's application to file an answer *de novo*. He also took a leading position in opposition to the application to segregate the income from the proposed sale of the buildings. He drew the application of the Kohn Committee to urge that the insurance and casualty fund be declared by the Court to belong to the Adjustment Income bondholders as a group. Although in that effort he was unsuccessful, it was an issue which required resolution. Mr. Endelman's time records disclose a total of 1,327 hours spent on the matter. He died during the course of the proceeding. As the SEC reported, "unfortunately, with Mr. Endelman's decease, we feel that the vigor of the representation of this group waned and thereafter the services were less meaningful." With Mr. Endelman's decease, Mr. Blumenthal became somewhat more active. He attended various conferences and hearings on the plan. However, there is no indication that he contributed anything of value to the estate by these appearances.

The SEC recommends that an allowance for Mr. Endelman's services should be $17,500. The Company counsel recommended that an allowance for these services, which should be the sole allow-

ance to counsel for the Kohn Committee, should be $25,000. The SEC, in addition to recommending an allowance of $17,500 for Mr. Endelman's services, recommended that $5,000 be paid to Mr. Blumenthal.

The Court accepts the recommendation of the SEC as to the compensation payable for Mr. Endelman's services and makes an allowance to his estate therefor in the sum of $17,500. The Court fails to see that Mr. Blumenthal's services aided the estate or that he is entitled to any compensation. It allows nothing to Mr. Blumenthal. It appears that Mr. Unger, the third attorney, was in a conflicting position in that he did not disclose to the Court the fact that he personally owned refunding mortgage bonds. There was no indication that Mr. Endelman, during his lifetime, was aware of Mr. Unger's ownership of these bonds. The SEC reported, however, that there was a conflict in representation by Mr. Unger and in a sense, misrepresentation to the persons who were solicited, and recommends, therefore, that Mr. Unger should not receive compensation. The Court agrees with this conclusion and awards Mr. Unger nothing.

These counsel seek reimbursement of $991.25 for out-of-pocket disbursements. The SEC recommends payment of $605.-17 for Mr. Endelman's expenses and $339.37 to Mr. Unger, a total of $944.54 for disbursements. This allowance is made by the Court.

The Jones Committee

The Jones Committee appeared in the proceeding as a protective committee for the adjustment income bonds. They seek an allowance of $15,000. At the outset of the proceeding they represented a little over one million dollars principal amount. But many of the bondholders withdrew, however, because they sold their bonds, and in the end the representation was of approximately $450,000 in bonds. The committee consisted of Thatcher C. Jones, Harry Kutik and Mortimer J. Goodstein. Mr. Goodstein, a lawyer, who acted as secretary of the committee, attended some meetings and did the necessary work to organize the committee and solicit bondholders. As the SEC reported, "we think such services as there may have been were largely those of counsel, although the committee did support those activities." The SEC reported that "services were minimal" and recommended an allowance of $1,500. Counsel for the Company recommended an allowance of $1,000.

The Court has searched the record and fails to find that any services were rendered by the committee which were of benefit to the estate. The services were largely the organization of the committee, the solicitation of bondholders, etc. Under the circumstances the Court sees no occasion for compensating the members of the committee in any amount. The application for compensation is denied. Disbursements are allowed in the sum of $770.20.

Louis Kipnis,

Mr. Kipnis acted as counsel for the Jones Committee. He did not keep time records. He estimated that he devoted approximately 1500 hours to the proceeding and seeks an allowance of $60,000, which would be at the rate of $40.00 an hour overall. He attended the various plan hearings and conferences. He makes no claim to any specific or particular contribution to the success of the reorganization and the plan. In general he acted in concert with other representatives of the same class of bondholders. Undoubtedly his routine examination of papers and attendance at hearings consumed a great deal of time, but the estate may not be charged therefor unless the time spent can be shown to have resulted in services beneficial to it. The SEC recommends compensation to Mr. Kipnis of $10,000. Company counsel recommended an allowance of $5,000.

The Court is unable to see where Mr. Kipnis is entitled to compensation payable out of the estate. He made no contribution of any substantial value to the reorganization. The mere fact that an attorney is willing to spend time attend-

ing hearings and conferences, contributing nothing thereto, does not mean in and of itself that the estate should be charged for such services. The Court denies the application for allowance of compensation to Mr. Kipnis.

Charles Poletti and Hoffman, Buchwald, Nadel & Hoffman, and Buchman & Buchman

■■■ These three groups of attorneys request an allowance of $50,000. It is a joint application by them. The original arrangement among them was that any fee would be divided a third to each.

The bondholders represented were clients and relatives of one set of attorneys, Buchman & Buchman. One of the Buchmans invited the Hoffman firm to appear, and that firm, in turn, invited the Poletti firm to join them in the matter. Apparently no one of the firms kept any records of the time spent on the matter.

Section 249 of the Bankruptcy Act provides in substance that an attorney or other representative may not be compensated if after starting to act in that capacity he has purchased or sold claims or stock of the debtor. One of the law partners in the firm of Buchman & Buchman was executor of the estate of Henry Buchman. The testimony was quite clear that bonds held in that estate were sold; that applicant was a co-executor and was one of the sellers of the bonds and that both Abraham and Henry Buchman were to inherit under the estate and would share in the proceeds of that estate after it was liquidated. Section 249 requires that compensation be denied to the firm of Buchman & Buchman under those circumstances. Surface Transit, Inc. v. Saxe, Bacon & O'Shea, 266 F.2d 862, at 868 (2d Cir. 1959).

There were, however, two other law firms associated with the firm of Buchman & Buchman. The Court agrees with the conclusion of the SEC that there was not that degree of intimacy among counsel that would call for this Court to bar compensation to co-counsel as well, and that therefore co-counsel are entitled to apply for compensation. It seems that these counsel appeared in the proceeding in the middle of 1955, at which point there were other representatives of the adjustment income bonds on the scene, plus the Indenture Trustee. They submitted certain documents, the substance of which was that the Port Authority was the natural agency to take over the property of the Debtor and that some means be devised to get the Port Authority into the situation, and that the Trustee negotiate with that agency. There was nothing original or unique about that suggestion. Thereafter they rendered certain services in connection with the plan of reorganization. Counsel proposed an amendment to the plan of reorganization which was rejected by the SEC and the Court. They then acted jointly with other counsel on the final amendment which marked the approval and consummation of the plan of reorganization. The SEC recommends payment of $6,000 as full and reasonable compensation for the remaining counsel entitled to compensation, that is to the Hoffman firm and to Charles Poletti. It points out that the bulk of the services was rendered by the Hoffman firm and feels that the bulk of whatever award is made should be given to that firm. Counsel for the Company has recommended a total allowance of $7,500 for all counsel in this matter. The Court accepts the recommendation of the SEC and awards the sum of $4,000 to the Hoffman firm and $2,000 to Mr. Poletti.

Application is also made for reimbursement of disbursements. A check made by the SEC indicates that only $267.73 of the requested amount is reimbursable. Certain other amounts were sought which were disbursements in connection with the allowance application and which obviously are not reimbursable out of the estate. Disbursements in the sum of $267.73 are allowed.

Strasser, Spiegelberg, Fried & Frank

■ This firm filed an application for allowances as counsel "for (1) Jack Marqusee and (2) Opposition Committee of

Hudson & Manhattan Adjustment Income Bondholders, of which Jack Marqusee was a Member." The amount requested is $29,300. Mr. Fried, a member of the firm, was attorney for Mr. Marqusee who was a substantial bondholder of Hudson & Manhattan. In September 1956, Mr. Marqusee's holdings were $245,000 of the principal amount of the bonds. Such services began at a time in September 1957 when Mr. Fried agreed to the Trustee's plan of reorganization. Thereupon Mr. Marqusee began a series of acquisitions of additional bonds as a result of which he had something like one million dollars in bonds by the time he filed his statement in court and appeared in the proceedings, and thereafter he acquired some $662,000 of the bonds, so that by the time of voting on the plan he owned $1,662,000 of these bonds.

Mr. Marqusee exercised his important position in voting against the reorganization plan that had been submitted by the Court; and through personal communication and newspaper advertising influenced other bondholders to so vote. While exercising this influence over the bondholders he continued to trade in the bonds. Under such circumstances Mr. Marqusee cannot look to the estate for reimbursement of his expenses. Finn v. Childs Co., supra. He and not the estate should pay his attorneys for services in connection with this matter. The evidence showed that during the years of these proceedings Mr. Marqusee was both buying and selling securities of Hudson & Manhattan. An analysis of the security transactions would indicate that he was speculating in securities of the company and that his attorney's services were used in an attempt to enhance the value of the securities in which he was speculating. His attorneys are certainly entitled to be paid for their services but there is no reason why they should be paid by the estate. The services are not compensable services within the meaning of the statute; no allowance is warranted.

Moses & Singer

Moses & Singer has filed an application for allowances for services in the proceeding as counsel for Oscar Gruss & Son. When they filed their first Section 210 statement, Oscar Gruss owned $1,238,000 of adjustment income bonds and it was as a representative of this class that Moses & Singer participated in the proceedings. However, the client started to liquidate its position almost immediately and by April 15, 1959 no longer had any interest in the securities of Hudson & Manhattan.

The law firm, however, continued to appear in court and attend conferences as attorneys for Oscar Gruss & Son because it did not learn the facts until later. Though the application for allowances seeks compensation for these latter services, Mr. Jaffee, a member of the firm who testified, admitted that once Oscar Gruss & Son sold out the law firm had no client and that "obviously, as a matter of law, if there is a period in which I did not have a client I cannot get paid for it."

Moreover, when this Court called upon all the participants in December 1959 to file a statement of their present holdings, counsel learned to its surprise that their client had no bonds. The client then, at the suggestion of counsel, resorted to what seemed to be subterfuge designed to lead everyone in the proceedings, including the Court, to believe that there still was a client and that the client still had an interest in the proceedings. Before the revised statement had to be filed the client purchased $5,000 face amount of the bonds so that it could be represented to the Court that Oscar Gruss & Son was an adjustment income bondholder. The acknowledged purpose was to avoid personal liability to the attorneys by shifting the obligation for their services to the estate. The SEC concluded: "We think it is quite clear that the brokerage firm's [Oscar Gruss & Son's] primary interest was not staying with the reorgan-

ization for any length of time, but rather to trade and get the best possible deal it could on its investment. In our view, in these circumstances, counsel should look to their client for compensation and not to the estate." They recommend that compensation out of the estate should be denied. The Court concludes that no compensation should be paid out of the estate to the firm of Moses & Singer under the circumstances and denies their application.

Zane & Zane

■ The firm of Zane & Zane was retained on November 11, 1959 by a holder of adjustment income bonds to attempt to counteract Mr. Marqusee's activities. They moved by an order to show cause to disqualify the Marqusee holdings for purposes of determining the majority required for acceptance of the plan and for Marqusee's examination regarding his trading activities. The motion was argued on December 22, 1959. The Court reserved decision and ultimately the application was withdrawn. The application was rendered moot by virtue of an agreement embodied in Amendment No. 3 to the plan of reorganization. However the making of this application had some effect in securing the agreement of the parties to this amendment and to the ultimate success of the plan of reorganization. The SEC reports that it feels that this constituted "the limited extent to which applicant may reasonably seek compensation and we recommend a fee of $750." The Company counsel stated that the allowance should not exceed $1,-200. The Court allows to the firm of Zane & Zane a fee of $750.

### REPRESENTATIVE OF THE DEBTOR

Rosenman, Colin, Kaye, Petschek & Freund

■ This firm became counsel for the Debtor on August 20, 1954, nine days after the involuntary petition had been filed in this court. It continued to act as such until November 19, 1954, a period of about three months. For its services during this period it requests an allowance of $15,000.

The firm obtained an order authorizing the Debtor to continue operations of its business and successfully resisted an application by petitioning creditors to vacate that order.

The firm, on behalf of the Debtor, vigorously contested the involuntary petition in bankruptcy, moved to dismiss it and filed a brief and had oral argument. This was the major activity of the firm. It was unsuccessful. However, the services were necessarily ones that were proper, for somewhere along the line it became necessary to determine what type company this was and what appropriate provision of the Bankruptcy Act governed its reorganization. The services were rendered on an emergency basis and required the expenditure of a substantial amount of time. The application sets forth 304 hours of partners' time and 680 hours of associates' time. The SEC recommends that an allowance of $7,500 would be fair for these services. The attorney for the Company recommends an allowance not to exceed $5,000. The Court, taking into account the time spent, the nature of the services, and the standing of the firm, feels that the recommendation of the SEC is one which is proper. It allows the sum of $7,500 for services and allows reimbursement for disbursements in the sum of $321.35.

### CONCLUSION

There is attached hereto as an appendix a chart listing the applicants, the amount of allowance sought, the recommendations of the SEC, the recommendations of the Company and the amounts allowed by the Court.

This opinion will constitute the findings of fact and conclusions of law of the Court.

Company counsel should submit promptly an order conforming to the foregoing.

## APPENDIX

(Cents omitted)

| Applicant | Allowance Requested | | Recommendations | | | Amounts Allowed | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | S. E. C. | | Company | | |
| | Fees | Disbs. | Fees | Disbs. | Fees | Fees | Disbs. |
| Herman T. Stichman | $ 420,000 | $ 78 | $ 140,000 | $ 78 | $177,500 | $ 200,000 | $ 78 |
| McGoldrick Dannett Horowitz & Golub | 810,000 | 1,125 | 560,000 | 985 | 340,000 | 600,000 | 1,125 |
| Lamb Langan & Blake | 73,050 | 321 | 40,700 | 321 | 10,700 | 15,700 | 321 |
| Milton Keane & DeBona | 6,000 | 160 | 6,000 | 138 | 4,000 | 4,000 | 138 |
| Roberts & McInnis | 5,505 | 408 | 2,750 | 408 | 1,250 | 1,750 | 408 |
| Morgan Guaranty Trust | 28,858 | — | 6,500 | — | 7,500 | 6,500 | — |
| Davis Polk Wardwell Sunderland & Kiendl | 45,000 | 144 | 27,500 | 96 | 25,000 | 27,500 | 96 |
| Alan V. Lowenstein | 23,500 | 210 | 10,000 | 210 | 12,000 | 10,000 | 210 |
| Arthur Miller | 36,000 | — | 7,500 | — | None | None | — |
| Manufacturers Hanover Trust Company | 25,000 | 1,329 | 15,000 | 1,329 | 15,000 | 15,000 | 1,329 |
| Kelley Drye Newhall Maginnes & Warren | 86,000 | — | 65,000 | — | 50,000 | 65,000 | — |
| CARRIED FORWARD | $1,558,913 | $ 3,775 | $ 880,950 | $ 3,565 | $642,950 | $ 945,450 | $ 3,705 |

## APPENDIX

(Cents omitted)

| Applicant | Allowance Requested Fees | Disbs. | Recommendations S. E. C. Fees | Disbs. | Company Fees | Amounts Allowed Fees | Disbs. |
|---|---|---|---|---|---|---|---|
| BROUGHT FORWARD ..... | $1,558,913 | $ 3,775 | $ 880,950 | $ 3,565 | $642,950 | $ 945,450 | $ 3,705 |
| House Grossman Vorhaus & Hemley, and Edward M. Garlock ..... | 250,000 | 3,186 | 100,000 | 2,378 | 25,000 | 50,000 | 2,378 |
| Haas Committee ..... | 10,000 | 827 | 3,000 | 827 | 1,500 | 2,000 | 827 |
| Harold P. Seligson and Morton E. Yohalem ..... | 115,000 | 1,776 | 50,000 | 216 | 30,000 | 40,000 | 216 |
| Crockett Committee ..... | 12,500 | — | 3,000 | — | 3,000 | 3,000 | — |
| Joseph Milner ..... | 25,000 | 622 | 3,500 | 622 | None | None | 622 |
| Aranow Brodsky Bohlinger Einhorn & Dann ..... | 93,000 | 639 | 50,000 | 581 | 20,000 | 50,000 | 581 |
| Morgan Guaranty Trust .... | 2,530 | — | 500 | — | None | 500 | — |
| Chemical Bank New York Trust Company ..... | 15,000 | — | 3,000 | — | 6,000 | 3,000 | — |
| Cravath Swaine & Moore ... | 12,500 | — | 7,500 | — | 10,000 | 7,500 | — |
| Proskauer Rose Goetz & Mendelsohn ..... | 50,000 | 1,118 | 27,500 | 820 | 25,000 | 27,500 | 820 |
| Kohn Committee ..... | 17,500 | — | 2,000 | — | 2,000 | 2,000 | — |
| CARRIED FORWARD ..... | $2,161,943 | $11,943 | $1,130,950 | $ 9,009 | $765,450 | $1,130,950 | $ 9,149 |

## APPENDIX

(Cents omitted)

| Applicant | Allowance Requested Fees | Allowance Requested Dishs. | Recommendations — S. E. C. Fees | Recommendations — S. E. C. Dishs. | Recommendations — Company Fees | Amounts Allowed Fees | Amounts Allowed Dishs. |
|---|---|---|---|---|---|---|---|
| Brought Forward | $2,161,943 | $11,943 | $1,130,950 | $9,009 | $765,450 | $1,130,950 | $9,149 |
| Milton M. Unger | 90,000 | 386 | None | 339 | | None | 339 |
| Daniel W. Blumenthal | — | — | 5,000 | — | | None | — |
| Estate of Edward Endelman | 15,000 | 605 | 17,500 | 605 | 25,000 | 17,500 | 605 |
| Jones Committee | | 770 | 1,500 | 770 | 1,000 | None | 770 |
| Louis Kipnis | 60,000 | — | 10,000 | — | 5,000 | None | — |
| Charles Poletti | 50,000 | 380 | 6,000 | 267 | 7,500 | 2,000 | 267 |
| Hoffman Buchwald Nadel & Hoffman | | | None | | | 4,000 | |
| Buchman & Buchman | | | | | | None | |
| Strasser Spiegelberg Fried & Frank | 29,300 | 142 | 4,000 | — | None | None | None |
| Moses & Singer | 17,500 | — | None | — | None | None | — |
| Zane & Zane | 2,650 | — | 750 | — | 1,200 | 750 | — |
| Rosenman Colin Kaye Petschek & Freund | 15,000 | 449 | 7,500 | 321 | 5,000 | 7,500 | 321 |
| Totals | $2,441,393 | $14,675 | $1,183,200 | $11,311 | $810,150 | $1,162,700 | $11,451 |